## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION and
    AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION,

<em>Plaintiffs</em>,

v.

DEPARTMENT OF JUSTICE, including its
    components the OFFICE OF LEGAL COUNSEL
    and the OFFICE OF INFORMATION POLICY,
    DEPARTMENT OF DEFENSE, DEPARTMENT
    OF STATE, and CENTRAL INTELLIGENCE
    AGENCY,

<em>Defendants</em>.

No. 15 Civ. 1954 (CM)

**ECF CASE**

## CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Jameel Jaffer
Hina Shamsi
Brett Max Kaufman
Matthew Spurlock
American Civil Liberties Union Foundation
125 Broad Street—18th Floor
New York, New York 10004
T: 212.549.2500
F: 212.549.2654
jjaffer@aclu.org

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

RECORDS STILL AT ISSUE IN THIS LITIGATION ..................................................... 2

ARGUMENT ..................................................................................................................... 4

    I.    The government has not justified the withholding of final agency legal memoranda ........ 4

        A.    The agencies have not justified their withholding of the final legal memoranda under Exemptions 1 and 3 because they have not demonstrated that legal analysis is inextricably intertwined with information that is properly withheld ...................................................................................... 4

        B.    The agencies have not justified their withholding of the final legal memoranda under Exemption 5 ......................................................... 10

    II.    The government has not justified the withholding of legal and policy standards in the PPG ..................................................... 15

    III.    The government has not justified the redactions of legal and policy standards from the DOD Reports ..................................................... 20

    IV.    The government must release those parts of the legal memoranda that contain information or analysis the government has disclosed in other contexts ............. 22

        A.    The Second Circuit has instructed that official acknowledgment under FOIA does not require a precise "match" between the information the government seeks to withhold and the information it has previously disclosed ................................................................. 22

        B.    Information that the government has officially acknowledged cannot be withheld under *any* of FOIA's exemptions ....................................... 23

        C.    This Court's waiver analysis should not disregard unambiguous statements by members of Congress and cleared statements by former high-ranking officials ................................................................ 25

        D.    The government's efforts to minimize the effect of official acknowledgments in this case are unpersuasive ................................... 29

CONCLUSION .................................................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOD,*
    628 F.3d 612 (D.C. Cir. 2011) ............................................................... 26

*ACLU v. DOJ,*
    No. 12 Civ. 794, 2015 WL 4470192 (S.D.N.Y. July 16, 2015) ............................................. 23

*Afshar v. DOS,*
    702 F.2d 1125 (D.C. Cir. 1983) ............................................................... 23

*Alfred A. Knopf, Inc. v. Colby,*
    509 F.2d 1362 (4th Cir. 1975) ............................................................... 26, 28

*Ameziane v. Obama,*
    699 F.3d 488 (D.C. Cir. 2012) ............................................................... 26

*Amnesty Int'l USA v. CIA,*
    728 F. Supp. 2d 479 (S.D.N.Y. 2010) ............................................................... 18

*Brennan Ctr. for Justice at N.Y. Univ. Sch. Of Law v. DOJ,*
    697 F.3d 184 (2d Cir. 2012) ............................................................... 10, 11, 13, 18

*Brinton v. DOS,*
    636 F.2d 600 (D.C. Cir. 1980) ............................................................... 14

*Citizens for Responsibility & Ethics in Wash. v. DHS,*
    514 F. Supp. 2d 36 (D.D.C. 2007) ............................................................... 16

*Ctr. for Effective Gov't v. DOS,*
    7 F. Supp. 3d 16 (D.D.C. 2013) ............................................................... 16, 18

*Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative,*
    505 F. Supp.2d 150 (D.D.C. 2007) ............................................................... 6

*Ctr. on Corp. Responsibility, Inc. v. Shultz,*
    368 F. Supp. 863 (D.D.C. 1973) ............................................................... 15

*Fisher v. United States,*
    425 U.S. 391 (1976) ............................................................... 11

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) ............................................................... 26

*Frugone v. CIA*,
   169 F.3d 772 (D.C. Cir. 1999) .................................................................................... 26

*Gardels v. CIA*,
   689 F.2d 1100 (D.C. Cir. 1982) .................................................................................. 25

*Hepting v. AT & T Corp.*,
   439 F. Supp. 2d 974 (N.D. Cal. 2006) ........................................................................ 27

*Hoch v. CIA*,
   No. 88-5422, 1990 WL 102740 (D.C. Cir. July 20, 1990) ......................................... 26

*In re Application of the FBI for an Order Requiring the Production of Tangible Things
   From [Redacted]*,
   No. BR 13-25 (FISC Feb. 19, 2013) ........................................................................... 10

*In re Orders Interpreting Section 215 of the PATRIOT Act*,
   No. Misc. 13-02, 2014 WL 5442058 (FISC Aug. 7, 2014) .................................... 9, 10

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) .............................................................................. 16, 18

*Jordan v. DOJ*,
   591 F.2d 753 (D.C. Cir. 1978) ................................................................................ 9, 13

*Judicial Watch, Inc. v. DOJ*,
   365 F.3d 1108 (D.C. Cir. 2004) .................................................................................. 16

*Loving v. DOD*,
   550 F.3d 32 (D.C. Cir. 2008) ................................................................................ 16, 18

*McGehee v. Casey*,
   718 F.2d 1137 (D.C. Cir. 1983) .................................................................................. 29

*Mead Data Cent., Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ................................................................................ 7, 11

*N.Y. Times v. DOJ*,
   756 F.3d 100 (2d Cir. 2014) ............................................................................... passim

*N.Y. Times v. DOJ*,
   No. 14-4432, 2015 WL 7423815 (2d Cir. Oct. 22, 2015) ..................................... 14, 25

*Nat'l Council of La Raza v. DOJ*,
   411 F.3d 350 (2d Cir. 2005) .................................................................................. 11, 14

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) .................................................................................... 18

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................................ passim

*Powell v. U.S. Bureau of Prisons*,
    927 F.2d 1239 (D.C. Cir. 1991) .................................................................. 31

*Pub.. Citizen, Inc. v. OMB*,
    598 F.3d 865 (D.C. Cir. 2009) ...................................................................... 9

*Schlesinger v. CIA*,
    591 F. Supp. 60 (D.D.C. 1984) .................................................................. 26

*Senate of P.R. on Behalf of Judiciary Comm. v. DOJ*,
    823 F.2d 574 (D.C. Cir. 1987) .................................................................... 12

*Snepp v. United States*,
    444 U.S. 507 (1980) .................................................................................... 29

*Stokes v. Brennan*,
    476 F.2d 699 (5th Cir. 1973) ........................................................................ 9

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) .................................................................... 11

*Tax Analysts v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002) ...................................................................... 14

*Terkel v. AT & T Corp.*,
    441 F. Supp. 2d 899 (N.D. Ill. 2006) .......................................................... 27

*United States v. Marchetti*,
    466 F.2d 1309 (4th Cir. 1972) .................................................................... 25

*United States v. Nixon*,
    418 U.S. 683 (1974) .............................................................................. 16, 18

*United States v. Reynolds*,
    345 U.S. 1 (1953) .................................................................................. 15, 16

*Watts v. Indiana*,
    338 U.S. 49 (1949) ................................................................................ 27, 30

*Wilson v. CIA*,
  586 F.3d 171 (2d Cir. 2009) .................................................................................... 25

**Statutes**

5 U.S.C. § 552 ................................................................................................... passim

50 U.S.C. § 3024 ........................................................................................................ 6

50 U.S.C. § 413b .................................................................................................... 28

**Other Authorities**

Charlie Savage, *Power Wars* (2015) ...................................................................... 17

Executive Order 13,526 .............................................................................. 5, 7, 8, 21

Jack Goldsmith, *The Significance of DOJ's Weak Response to Rogers'*
  *Acknowledgment of CIA Drone Strikes*, Lawfare (Feb. 15, 2013, 10:09 AM) ...................... 26

Jack Goldsmith, *Thoughts on Today's Important Drone FOIA Oral Argument in DC*
  *Circuit*, Lawfare (Sept. 20, 2012, 6:34 AM) .......................................................... 28

## INTRODUCTION

Plaintiffs the American Civil Liberties Union and the American Civil Liberties Union Foundation (together, the "ACLU") submit this consolidated opposition and reply memorandum in further support of their cross-motion for summary judgment for records concerning the government's "targeted killing" of suspected militants and terrorists.

In its consolidated brief, the government invokes Freedom of Information Act ("FOIA") Exemptions 1, 3, and 5 to justify its withholdings. As explained below, the government's withholdings under Exemptions 1 and 3 are unlawful insofar as the withheld information consists of legal analysis not inextricably intertwined with other, properly classified information. Here, there is every reason to believe that at least some of the legal analysis in the withheld records can be segregated from information that FOIA protects.

The government's withholding of legal and policy analysis under Exemption 5 is also unlawful. Importantly, as explained below, the ACLU is not seeking drafts. The government has not established that any common-law privilege applies to the records the ACLU actually seeks. Moreover, no common-law privilege encompassed by Exemption 5 can justify the government's refusal to disclose "working law."

Finally, the government's withholdings are also improper to the extent the withheld information consists of information the government has officially released in other contexts. It is well settled that once the government has officially acknowledged information, it may not lawfully withhold closely related information unless that information is materially different from the information the government has already disclosed. As explained in detail in the ACLU's opening brief and as further elaborated below, the government has officially acknowledged a great deal of information about the targeted-killing program, including some of the legal

standards that govern it. There is good reason to believe that at least some of the records at issue here contain such information, which must be disclosed.

For these reasons and the others discussed further below, the ACLU respectfully asks that the Court review some of the withheld records *in camera* to determine whether they are in fact protected by the exemptions the government cites. More specifically, the ACLU asks that the Court review *in camera* (i) the Presidential Policy Guidance; (ii) two Department of Defense reports; and (iii) a sample of the final legal memoranda.

### RECORDS STILL AT ISSUE IN THIS LITIGATION

Pursuant to the Court's scheduling order, the ACLU limited the focus of its August 28, 2015 brief to the government's waiver through public disclosure of otherwise-applicable FOIA exemptions. *See* ACLU Br. 4–5, ECF No. 33. In this opposition and reply brief, the ACLU for the first time addresses the agencies' invocations of FOIA's exemptions. *See id.* at 5.

The ACLU has already narrowed its Request considerably, *see* ACLU Br. 3–4, and it would likely be able to narrow its Request even further if the government provided more information about the records being withheld. However, because the agencies' *Vaughn* indices do not include basic information such as the authors, recipients, dates, and subjects of the records, the following records remain at issue:

- **Classified final legal memoranda[1] withheld under Exemptions 1, 3, and/or 5, including:**

  - Department of Justice ("DOJ") Office of Legal Counsel ("OLC"): An unknown number of "[c]lassified documents providing confidential OLC legal advice to Executive Branch policymakers that pertain to or discuss, inter alia,

---

[1] The ACLU uses the term "legal memoranda" to refer to records described by the various agencies as "memoranda," "documents providing confidential legal advice," or "classified paper[s]." The ACLU uses the term "final" here because it does not seek records that are drafts and labeled as such.

(1) legal analysis of the use of lethal force against individual terrorists or terrorist groups [or] (2) the development and implementation of Executive Branch processes for making determinations regarding the use of such force." Bies Decl. ¶ 46(a), ECF No. 38.[2]

- o <u>DOJ Office of Information Policy ("OIP")</u>: One classified memorandum listed as OIP Index no. 2. *See* ECF No. 43-5.

- o <u>DOJ National Security Division ("NSD")</u>: 18 classified memoranda listed as NSD Index nos. 1–18. *See* ECF No. 44-1.

- o <u>Central Intelligence Agency ("CIA")</u>: 13 classified memoranda listed as CIA Index nos. 2, 4, 6, 12–16, 23–24, 27, 29–30. *See* ECF No. 42-1.

- o <u>Department of Defense ("DOD")</u>: 36 classified memoranda listed as DOD Index nos. 1, 3–6, 14–16, 18, 21, 24–25, 27–50. *See* ECF No. 39.[3]

- o <u>Department of State ("DOS")</u>: 14 classified memoranda listed as DOS Index nos. 1–5, 9–13, 17–18, 21–22. *See* ECF No. 40-8.

- **Passages in the Presidential Policy Guidance ("PPG")**[4] that establish legal and policy standards, contain legal analysis, or define legal terms. *See* Lewis Decl. ¶¶ 17–20.

---

[2] The OLC states that it has "approximately 244 responsive records" that are "marked classified or protected from disclosure by statute," Bies Decl. ¶ 24, but the agency does not enumerate or describe the records. It states that the records "include" records falling into seven categories, Bies Decl. ¶¶ 46(a)–(g), but the categories are broadly framed and the agency does not say how many of the "approximately 244" withheld records fall into each category. Nonetheless, the ACLU withdraws its request for records described in categories (b)–(g); it seeks only records described in category (a). Even with respect to records described in category (a), the ACLU withdraws its request for records relating to the "content of speeches or public statements regarding such legal analysis or Executive Branch decisions," Bies Decl. ¶ 46(a)(3). The ACLU does *not* waive its right to records that fall into both category (a) and another category.

[3] Plaintiffs do not seek the disclosure of "operational plans for potential military strikes, created in accordance with the PPG" or classified documents that "discuss DoD's application of the PPG" to specific anticipated strikes, Lewis Decl. ¶¶ 22, 28, ECF No. 39. The DOD does not say which records fall in these categories.

[4] Procedures for Approving Direct Action Against Terrorist Targets Located Outside of the United States and Areas of Active Hostilities (May 22, 2013).

- **Passages in two DOD reports (the "DOD Reports") submitted to Congress**
  pursuant to the National Defense Authorization Act for 2014 that discuss "the
  definitions and the process to determine if an entity is an affiliate, associated force,
  and/or adherent of al Qaeda or the Taliban [and] provide an explanation of the legal
  and policy considerations and approval process used in determining whether an
  individual or groups of individuals could be a target of a lethal or capture operation
  conducted by the Armed Forces outside of the United States and outside of
  Afghanistan." Lewis Decl. ¶ 11; *see id.* ¶¶ 11–16. The DOD Reports, released to the
  ACLU in this litigation, are:

  - Report on Associated Forces (July 2014) ("Report on Associated Forces")
    (Second Spurlock Decl. Exh. 51).

  - Report on Process for Determining Targets of Lethal or Capture Operations
    (Mar. 6, 2014) ("Report on Process") (Second Spurlock Decl. Exh. 52).

## ARGUMENT

## I.   The government has not justified the withholding of final agency legal memoranda.

### A.   The agencies have not justified their withholding of the final legal memoranda under Exemptions 1 and 3 because they have not demonstrated that legal analysis is inextricably intertwined with information that is properly withheld.

In its first substantive response to the ACLU's Request, the government withholds in full

82 final legal memoranda from various agencies, as well as an unknown number from OLC,

under Exemptions 1 and 3.[5] The government's blanket withholding of these records under

Exemptions 1 and 3 is unlawful. Because neither Exemption 1 nor 3 protect legal analysis, the

---

[5] Insofar as Plaintiffs are able to discern from the government's public declarations and indices, the agencies assert both Exemptions 1 and 3 for the majority of the records in this category. For a small number of records in this category, the agencies have not invoked Exemption 3. *See* DOD Index nos. 1, 3, 16, 18, 21, 25 & 27, ECF No. 39; DOS Index nos. 10 & 17, ECF No. 40–8.

only question is whether the legal analysis in the final memoranda is inextricably intertwined with material that is exempt. *See N.Y. Times v. DOJ*, 756 F.3d 100, 119 (2d Cir. 2014). Here, the agencies have not demonstrated that all of the legal analysis in the withheld final legal memoranda is inextricably intertwined with protected information.

Under Exemption 1, the government may withhold information that is "specifically authorized under criteria established by an Executive order and . . . properly classified pursuant to such Executive order." 5 U.S.C. § 552 (b)(1). Here, the government relies on Executive Order 13,526, which provides, *inter alia*, that information may be classified if (1) it "pertains to" one of the categories listed in the order, and (2) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and "is able to identify or describe the damage." Exec. Order 13,526 §§ 1.4, 1.1. With the exception of OLC—which asserts that certain unidentified withheld legal memoranda "are properly classified for the reasons set forth in the Government's classified, *ex parte* index," Gov't Br. 18, ECF No. 46—the agencies' declarations invoke a number of categories listed in the Executive Order, specifically §§ 1.4(a) ("military plans, weapons systems, or operations");[6] 1.4(b) ("foreign government information");[7] 1.4(c) ("intelligence sources or methods");[8] and 1.4(d) ("foreign relations or foreign activities"),[9] and they assert that any disclosure of the records would cause identifiable harm to national security. *See, e.g.*, Lewis Decl. ¶¶ 23–24; Hackett Decl. ¶ 35; Lutz Decl. ¶ 28; *see also* Gov't Br. 18.

---

[6] Wiegmann Decl. ¶ 8 (NSD), ECF No. 44; Lewis Decl. ¶ 35 (DOD); Hackett Decl. ¶ 29 (DOS), ECF No. 40.

[7] Hackett Decl. ¶¶ 30–31 (DOS).

[8] Wiegmann Decl. ¶ 8 (NSD); Hibbard Decl. ¶ 28 (OIP); Hackett Decl. ¶ 32 (DOS); Lewis Decl. ¶35 (DOD); Lutz Decl. ¶ 18 (CIA), ECF No. 40.

[9] Wiegmann Decl. ¶ 8 (NSD); Lutz Decl. ¶ 18 (CIA); Hackett Decl. ¶¶ 33–35 (DOS).

Under Exemption 3, the government may withhold information "specifically exempted from disclosure by statute." 5 U.S.C. 552 (b)(3). Here, the agencies rely on the National Security Act, 50 U.S.C. § 3024, which protects "intelligence sources and methods." *See* Bies Decl. ¶¶ 57 (OLC); Lutz Decl. ¶¶ 23, 28 (CIA); Lewis Decl. ¶¶ 19, 24 (DOD); Hackett Decl. ¶¶ 36–39 (DOS).[10]

Neither Exemption 1 nor Exemption 3 justifies the categorical withholding of the final agency legal memoranda. While the final legal memoranda at issue here undoubtedly contain *some* information that is directly protected by Exemption 1 or 3, the ACLU is not seeking such information; it is seeking only legal analysis that can be segregated from properly classified facts. Thus, the ACLU does not seek, for example, "operational plans against individuals or groups," Gov't Br. 14, detailed information about signals intelligence, or unknown clandestine sources and methods, *see id.* at 16–17.

The government contends that the withheld legal analysis concerns classified subjects, but the crucial question is not whether legal analysis *concerns* (in some broad sense) one of the categories in the Executive Order, but whether it is *inextricably intertwined* with information falling into one of those categories. *See, e.g.*, *N.Y. Times*, 756 F.3d at 119 (holding that legal analysis can be withheld under Exemption 1 to the extent it is inextricably intertwined with properly classified facts); *see also Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 505 F. Supp. 2d 150, 158 (D.D.C. 2007) ("Even if Exemption 1 is found to justify withholding the documents, [the government] may not automatically withhold the full

---

[10] Plaintiffs do not seek the names of agency personnel withheld under Exemptions 3 or 6. If the final legal memoranda responsive to the ACLU's narrowed request contain such information, such information can be redacted. *See* 5 U.S.C. § 552 (b).

6

document as categorically exempt without disclosing any segregable portions.").[11]

The government does not even attempt to explain on the public record why *all* of the legal analysis in the roughly *one hundred* withheld final memoranda is inextricably intertwined with properly withheld information. To the contrary, the government's argument on the public record is entirely conclusory. *See* Hudson Decl. ¶ 31, ECF No. 45; Wiegmann Decl. ¶¶ 16–17; Hibbard Decl. ¶¶ 34–35; Lutz Decl. ¶ 33; Hackett Decl. ¶ 42; Bies Decl. ¶¶ 59–62; Lewis Decl. ¶ 40. The government claims to have "demonstrated in its classified, *ex parte* index that the documents withheld in this case contain no reasonably segregable, non-exempt information," Gov't Br. 34, but the government has an obligation to provide at least some explanation *on the public record*, *see Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) (requiring agencies to justify segregation decisions on the public record by "provid[ing] the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts" and by "describ[ing] what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document").

Moreover, it is simply not plausible that all of the withheld legal analysis is intertwined inextricably with properly classified facts. The government has already made extensive disclosures of facts and law related to the targeted-killing program, *see* Waiver Table, ECF No. 33-1, making it likely that much of the supposedly protected information in the withheld records

---

[11] The Executive Order states that information may be classified if it "pertains to" one of eight enumerated categories, but the phrase "pertains to" does not allow the government to classify information simply because it relates in some remote way to national security. Read as a whole, the Executive Order is plainly intended to narrowly circumscribe the kinds of information that can be classified. *See, e.g.*, Exec. Order 13,526 § Preamble; *id.* § 1.7(a); *id.* §§ 1.4(a)–(g). The natural and logical construction of the Executive Order is that it authorizes classification only if the information in question falls into—that is, *belongs to*—one of the classification categories. *Cf. Pertain*, Merriam-Webster Dictionary (online ed.) http://www.merriam-webster.com/dictionary/pertain ("to belong as a part, member, accessory, or product.").

has already been acknowledged. And, even more important, the government has shown itself capable of extricating legal analysis from sensitive facts about the targeted-killing program in many contexts. Senior government officials have managed to speak publicly about the legal analysis underlying the drone program without disclosing properly classified facts. *See N.Y. Times*, 756 F.3d at 114–15. They have managed to draft white papers without disclosing properly classified facts. *See* May 2011 White Paper (Spurlock Decl. Exh. 12, ECF No. 34-12); November 2011 White Paper (Spurlock Decl. Exh. 15, ECF No. 34-15). They have released OLC memos without disclosing properly classified facts. *See* February 2010 OLC Memo (Spurlock Decl. Exh. 5, ECF No. 34-5); July 2010 OLC Memo (Spurlock Decl. Exh. 8, ECF No. 34-8). And in this litigation, DOD has (however inadequately, *see infra* § III) segregated and released similar legal analysis. *See* Report on Associated Forces; Report on Process; *see also* Lewis Decl. ¶¶ 11–16. Some of these records are redacted, but that is the point: Through careful redaction, it is possible to release legal analysis in a way that protects properly classified facts.

Finally, proper segregation would also defeat the government's arguments that the disclosure of the withheld final legal memoranda would "cause identifiable or describable damage to the national security," Exec. Order 13,526 § 1.4. To be sure, the agencies' declarations summarily assert various harms from disclosure—but the agencies' assertions ignore entirely the effect of proper segregation. For example, DOD justifies its withholding of classified legal analysis by asserting that its release would "inform[] individuals or groups of their status as contemplated targets, thereby allowing them to heighten security and implement evasive techniques." Gov't Br. 14 (citing Lewis Decl. ¶ 35); *see* Lewis Decl. ¶¶ 23. For its part, the CIA represents that "'it would greatly benefit terrorist organizations to know which clandestine sources and methods were used to obtain information about certain individuals and

groups, as well as the specific intelligence that these techniques produced,'" and "such information 'could be used by terrorist organizations to uncover current collection activities and take countermeasures to avoid detection by Intelligence Community agencies.'" Gov't Br. 16–17 (quoting Lutz Decl. ¶ 28). But legal analysis could readily be segregated from the kinds of information the government identifies. At the risk of belaboring the point, the ACLU is not asking the government to disclose, for example, "which clandestine sources and methods were used to obtain information." It is asking for legal analysis that can be segregated from factual information that is properly classified.[12]

For the foregoing reasons, Plaintiffs respectfully submit that the Court should examine a sample of the final legal memoranda *in camera* to determine whether legal analysis can be released without the disclosure of properly classified facts.[13]

---

[12] The government states that the disclosure of legal analysis might "embolden[] terrorist organizations by implying that their actions will not elicit a response by the United States." Gov't Br. 14 (citing Lewis Decl. ¶ 35). But the drafters of the FOIA struck a deliberate balance when they drafted statutory language that allows the government to withhold classified facts but requires it to disclose law. Indeed, the legislative history makes clear that one of FOIA's "principal purposes" was to "eliminate secret law"—a phenomenon that Congress thought of as pernicious and corrosive to democratic values. *Jordan v. DOJ*, 591 F.2d 753, 781 (D.C. Cir. 1978) (Bazelon, J., concurring) (quotation marks omitted); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153–54 (1975) (discussing the "strong congressional aversion to secret agency law" in FOIA); *see also, e.g., Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 872 (D.C. Cir. 2009) ("As we have repeatedly explained, FOIA provides no protection for such 'secret law' developed and implemented by an agency."); *Stokes v. Brennan*, 476 F.2d 699, 702 n.3 (5th Cir. 1973) ("[S]ecret law is an abomination." (quotation marks omitted)). It bears emphasis that FOIA expressly obliges federal agencies to disclose final legal opinions and adopted statements and interpretations of policy even in the absence of any request for such records. *See* 5 U.S.C. § 552 (a)(2).

[13] Notably, in other recent cases *in camera* review (and even the threat of such review) resulted in the disclosure of legal analysis that the government initially contended could not be disclosed. For example, in June 2013, the ACLU filed a motion asking the Foreign Intelligence Surveillance Court to unseal an opinion authorizing the government to collect metadata about hundreds of millions of domestic telephone calls. *See In re Orders Interpreting Section 215 of the PATRIOT Act*, No. Misc. 13-02, 2014 WL 5442058 (FISC Aug. 7, 2014). The government initially responded that "[a]fter careful review of the Opinion by senior intelligence officials and

**B.     The agencies have not justified their withholding of the final legal memoranda under Exemption 5.**

The government has not justified withholding the legal memoranda under Exemption 5 because it has not demonstrated that either of the privileges it invokes—the attorney–client privilege and the deliberative process privilege—actually applies. Moreover, even if the withheld memoranda (or some of them) would otherwise be protected by these privileges, the government cannot withhold the records to the extent they represent an agency's effective law or policy—and there is good reason to believe that at least some of the withheld records do.

Exemption 5 permits an agency to shield information that would be protected by traditional common-law privileges. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). "[I]t is the government's burden to prove that that privilege applies, and not the plaintiff's to demonstrate the documents sought fall within one of the enumerated section 552(a)(2) categories." *Brennan Ctr. for Justice at N.Y. Univ. Sch. Of Law v. DOJ*, 697 F.3d 184, 201–02 (2d Cir. 2012). With respect to final legal memoranda, the government asserts the deliberative-process and attorney–client privileges—although the agencies' public declarations do not make clear which privilege is claimed for which records. *See, e.g.*, Gov't Br. 21–25.[14]

The deliberative-process privilege shields information that is "predecisional" and

the [DOJ], the Executive Branch has determined that the Opinion should be withheld in full and a public version of the Opinion cannot be provided." *Id.* at *2 (quotation marks omitted). However, after the court ordered the government to submit "a detailed explanation of its conclusion," the government retracted its "object[ion]" to the release of certain portions of the opinion that were "not classified and the release of which would not jeopardize the ongoing investigation." *Id.* (quotation marks omitted). Later, the government told the court that even more of the opinion could be released, and the court published a public, largely unredacted version of the order on its website. *See* Opinion, *In re Application of the FBI for an Order Requiring the Production of Tangible Things From [Redacted]*, No. BR 13-25 (FISC Feb. 19, 2013), http://1.usa.gov/1js1r8Q.

[14] OLC's assertion of the attorney work-product privilege—distinct from the deliberative-process and attorney–client privileges—is limited to unclassified records no longer at issue in this litigation. *See* Bies Decl. ¶ 40.

"deliberative." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005). A document is "predecisional" if it was "prepared in order to assist an agency decisionmaker in arriving at his decision," and "deliberative" if it is "actually . . . related to the process by which policies are formulated." *Id.* at 356; *see Mead*, 566 F.2d at 256 n.40 ("There may also be circumstances in which what might easily be labeled 'deliberative' rather than 'factual' material must be disclosed because it would not reveal the deliberative process within the agency."). The deliberative-process privilege is intended to "prevent injury to the quality of agency decisions" by shielding non-final analysis from disclosure. *Sears*, 421 U.S. at 151.

The attorney–client privilege shields communications from clients to their attorneys made for the purpose of securing legal advice. *Brennan Ctr.*, 697 F.3d at 207. The privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Importantly, the privilege only protects communications from *attorneys to their clients* insofar as necessary to "protect the secrecy of the underlying facts" obtained from the client. *Mead*, 556 F.2d at 254 n.28; *see also Tax Analysts v. IRS,* 117 F.3d 607, 618 (D.C. Cir. 1997).

As an initial matter, the government has not shown that either of the Exemption 5 privileges applies to the final legal memoranda still at issue in this litigation.[15] Many of the agencies' justifications for invoking the privileges simply do not apply to the *final* legal memoranda the ACLU continues to seek.[16] Moreover, even where the agencies' public

---

[15] As described above, the ACLU has excluded all records that are drafts and labeled as such. *See supra* § INTRODUCTION.

[16] Most of the agencies' references to the deliberative-process privilege relate to records other than final legal memoranda. *See, e.g.*, Bies Decl. ¶¶ 51 (OLC withholding of "deliberations regarding and comments on draft legal analysis or other work product"), 53 (OLC withholding of "factual materials . . . provided to OLC or other Executive Branch attorneys"); Lewis Decl. ¶¶ 26, 30, 32 (DOD withholding of draft operational plans, predecisional deliberations regarding

declarations appear to invoke the two privileges in relation to final legal memoranda, the invocations are entirely conclusory.[17] For example, while OLC explains that "[m]any of the withheld classified records contain or reflect confidential, predecisional legal advice provided to Executive Branch policymakers or internal Executive Branch legal deliberations regarding such advice," it does not assert that *all* of the records do. Bies Decl. ¶ 50; *see* Hackett Decl. ¶¶ 39–40 (DOS "has withheld information in a number of documents . . . pursuant to the deliberative process privilege" and "also has withheld certain information in this case pursuant to the attorney–client privilege"); Lewis Decl. ¶ 34 (DOD withholding "much of [its] legal analysis" under the attorney–client privilege). Moreover, the agencies do not explain how the withheld documents were produced and at whose request, how they were used, who they were shared with—let alone what they address. The agencies' declarations lack anything approaching the justification courts have required in other cases. *See, e.g.*, *Senate of P.R. on Behalf of Judiciary Comm. v. DOJ*, 823 F.2d 574, 584 (D.C. Cir. 1987) (agency must provide sufficient information "so that a reviewing court can sensibly determine whether each invocation" of an Exemption 5 privilege "is properly grounded"). The agencies have not supplied the ACLU (or the public) with

---

application of PGP, and predecisional legal analysis); Hibbard Decl. ¶¶ 31–32 (OIP withholding of drafts, briefing materials, talking points, and preparatory materials); Wiegmann Decl. ¶¶ 9–10 (NSD withholding of records reflecting deliberations in conjunction with other DOJ components); Lutz Decl. ¶ 31 (CIA withholding of predecisional records including drafts "reveal[ing] an interim stage in intra- and inter-agency discussions, which preceded a final decision of the CIA or other agency.").

The same is true of the agencies references to the attorney–client privilege. *See, e.g.*, Lewis Decl. ¶ 34 ("communication between DOD officials and the Department of Justice or other Executive Branch components in connection with request for the provision of legal advice"); Lutz Decl. ¶ 32 (same); Hackett Decl. ¶ 40 ("The withheld information reflects the two-way confidential communications that occur between attorneys and their clients when seeking and providing legal advice.").

[17] *See, e.g.*, Hackett Decl. ¶ 39 (conclusory invocation of the deliberative-process privilege); Wiegmann Decl. ¶ 11 (conclusory invocation of the attorney–client privilege); Hibbard Decl. ¶ 30 (conclusory invocation of Exemption 5 generally).

any basis on which to conclude that the documents are in fact covered by the privileges the government invokes.

Moreover, the government's categorical withholding of final legal memoranda is almost certainly unlawful even if all the records fall within the presumptive scope of Exemption 5. That is because Exemption 5 does not allow the withholding of "opinions and interpretations which embody the agency's effective law and policy." *Brennan Ctr.*, 697 F.3d at 202 (citing *Sears*, 421 U.S. at 153); *id.* at 194–95 ("[D]ocument[s] claimed to be exempt will be found outside Exemption 5 if [they] closely resemble[] that which FOIA affirmatively requires to be disclosed," including "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." (quoting 5 U.S.C. § 552 (a)(2)(A)–(B))). To the contrary, FOIA mandates the disclosure of such opinions to the public. *See* 5 U.S.C. § 552 (a)(2)(A)–(B); *Sears*, 421 U.S. at 153; *Jordan v. DOJ*, 591 F.2d 753, 774 (D.C. Cir. 1978). As the Supreme Court explained in *Sears*, any judicial application of Exemption 5 must account for the "strong congressional aversion to secret agency law" and the "affirmative congressional purpose to require disclosure of documents which have the force and effect of law." 421 U.S. at 153 (quotation marks omitted).

Neither the deliberative-process nor the attorney–client privilege shields an agency's final legal analysis or statements of policy; nor do they allow withholding of post-decisional documents explaining an agency's legal position, policy, or action. As the Supreme Court explained in *Sears*:

> The distinction [between privileged documents and those that reflect the agency's effective law and policy] is supported not only by the lesser injury to the decisionmaking process flowing from disclosure of post-decisional communications, but also, in the case of those communications which explain the decision, by the increased public interest in knowing the basis for agency policy already adopted. The public is only marginally concerned with reasons supporting

13

> a policy which an agency has rejected, or with reasons which might have
> supplied, but did not supply, the basis for a policy which was actually adopted on
> a different ground. In contrast, the public is vitally concerned with the reasons
> which did supply the basis for an agency policy actually adopted.

421 U.S. at 152; *see La Raza*, 411 F.3d at 359; *see also Brinton v. DOS*, 636 F.2d 600, 605 (D.C.

Cir. 1980).

Here, there is good reason to believe that at least *some* of—or at the very least, *some*

*portions of*—the withheld final legal memoranda represent the agencies' effective law and policy

with respect to the targeted-killing program. This is certainly the case with respect to memoranda

drafted by the respective agencies' counsel. *See Tax Analysts v. IRS*, 294 F.3d 71, 81 (D.C. Cir.

2002) ("[I]t is not necessary that the [memoranda] reflect the final *programmatic* decisions of the

program officers . . . [so long as they] represent the [Office of Chief Counsel's] final *legal*

position . . . ."). Indeed, the government itself has conceded, in related litigation, that such

memoranda would constitute agency "working law." Specifically, in *N.Y. Times v. DOJ*, No. 14-

4432, 2015 WL 7423815 (2d Cir. Oct. 22, 2015) ("*N.Y. Times II*"), the government sought to

withhold OLC memoranda related to the targeted-killing program by distinguishing those

memoranda from final memoranda produced by other agencies. OLC memoranda about the

targeted-killing program, the government argued, are not binding in the way that agency general-

counsel memoranda would be. Gov't Br. 50–51, *N.Y. Times v. DOJ*, No. 14-4432 (2d Cir. Apr. 4,

2015), ECF No. 89. Having made that argument in another court, the government should not be

permitted to pretend here that agency memoranda by authoritative legal officials are something

other than working law.[18]

---

[18] To be clear, Plaintiffs believe that certain OLC memoranda are *also* "effective law" that must
be disclosed under FOIA. But whatever the status of OLC memoranda under FOIA, it is well
settled that memoranda that reflect the "final legal position" of agency general-counsel are
"effective law" unprotected by Exemption 5.

**II.    The government has not justified the withholding of legal and policy standards in the PPG.**

The government must release the PPG to the extent it contains legal and policy standards relating to the use of lethal force against suspected terrorists. The government withholds the entirety of the PPG pursuant to Exemption 5 (invoking the presidential-communications privilege) and Exemptions 1 and 3 (invoking "military plans, weapons systems, or operations" and "intelligence sources and methods"). *See* Gov't Br. 12–13, 25–26; Bies Decl. ¶ 54; Hackett Decl. ¶ 41; Lewis Decl. ¶¶ 17–20. But while these exemptions may justify the withholding of some parts of the PPG, they do not justify the withholding of legal and policy standards in the document.[19] First, the government has not properly invoked the presidential-communications privilege. Second, the presidential-communications privilege does not protect documents that regulate executive agencies. Third, the government may not rely on the presidential-communications privilege (or Exemption 5 more generally) to withhold the government's "working law." And finally, legal and policy standards cannot be withheld under Exemptions 1 or 3 unless they are inextricably intertwined with properly classified facts.

As a threshold matter, the government cannot withhold the PPG on the basis of the presidential-communications privilege because the President has not personally invoked the privilege. The government cannot rely on the privilege unless the President invokes it himself. *See Ctr. on Corp. Responsibility, Inc. v. Shultz*, 368 F. Supp. 863, 873 (D.D.C. 1973); *cf. United States v. Reynolds*, 345 U.S. 1, 8 (1953) (holding that closely related state-secrets privilege must be formally "lodged by the head of the department which has control over the matter").[20]

---

[19] By "legal and policy standards," the ACLU means to include information concerning who makes certain decisions and how those decisions are to be made.

[20] Not all courts have required that the presidential-communications privilege be invoked by the President himself. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. DHS*, 514 F. Supp.

Because the government's declarations do not suggest that the President has personally invoked the privilege here, *see* Bies Decl. ¶ 54, the Court need not even consider the potential application of the presidential-communications privilege to the PPG.

Second, the PPG cannot be withheld on the basis of the presidential-communications privilege because the privilege does not extend to documents that regulate executive agencies. The presidential-communications privilege protects "[p]residential communications," but its protections are not absolute. *United States v. Nixon*, 418 U.S. 683, 708 (1974). It is intended to ensure the "expectation of a President to the confidentiality of his conversations and correspondence." *Nixon*, 418 U.S. at 708. The privilege reflects "the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.*; *see also Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008) (explaining that the privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially"); Gov't Br. 26 (acknowledging that the privilege protects "closely-held presidential directives"). Recognizing its limited purpose, courts construe the scope of the privilege "as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected." *In re Sealed Case*, 121 F.3d at 752; *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1115 (D.C. Cir. 2004) (remarking upon the "dangers of expanding [the privilege] too far"); *Ctr. for Effective Gov't v. DOS*, 7 F. Supp. 3d 16, 27 (D.D.C. 2013) (Huvelle, J.) (explaining that because the privilege does not apply to documents that "do not implicate the goals of candor, opinion-gathering, and effective decision-

---

2d 36, 48 n.10 (D.D.C. 2007); *see also Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (explaining that the issue remains an "open question" in the D.C. Circuit); *In re Sealed Case*, 121 F.3d 729, 744 n.16 (D.C. Cir. 1997) (citing *Reynolds*, 345 U.S. at 7–8). Plaintiffs respectfully suggest that these cases are wrongly decided and inconsistent with the Supreme Court's admonition in *Reynolds*.

making that confidentiality under the privilege is meant to protect," it does not "extend to documents created by the President and widely transmitted to multiple agencies and their staffers who serve in non-advisory roles to the President").

Extending the presidential-communications privilege to the PPG would require radically expanding a privilege that other courts—including the Supreme Court—have been careful to cabin. Far from being a closely held document forming an integral part of a deliberative process between the President and his closest advisors, the PPG regulates agency action—indeed, that is its very point. The President himself has stated that the PPG includes legal and policy standards that bind the conduct of the executive branch. *See* May 2013 Obama Speech (Spurlock Decl. Exh. 32, ECF No. 34-32) ("And that's why, over the last four years, my administration has worked vigorously to establish a framework that *governs* our use of force against terrorists— insisting upon clear guidelines, oversight and accountability that is now *codified* in Presidential Policy Guidance that I signed yesterday." (emphases added)); *see also* Charlie Savage, *Power Wars* 284 (2015) (reporting that the PPG is "*a form of an executive order* that codified a set of rules and procedures to govern killings away from hot battlefields" (emphasis added)).[21] And the President distributed the PPG to executive-branch agencies so that they could implement, analyze, and discuss those binding standards. *See, e.g.*, Gov't Br. 13 (discussing DOD's "application of the PPG," "analysis of implementation of the PPG," and "deliberations regarding

---

[21] According to a government fact sheet published in connection with President Obama's May 23 speech at National Defense University, the PPG includes criteria that the government uses to: (1) determine when there is a near certainty that a target is present; (2) determine when there is a near certainty that non-combatants will not be injured or killed; (3) assess whether capture is feasible at the time of a counterterrorism operation; (4) determine that relevant authorities will not effectively address the threat to U.S. persons; and (5) determine that no reasonable alternative exists to address the threat to U.S. persons; as well as other factors. *See* May 2013 Fact Sheet (Spurlock Decl. Exh. 33, ECF No. 34-33); *see also* Waiver Table at 11–13, 14, 16– 17, 18, 38–39.

whether any changes to the PPG should be considered" (citing Lewis Decl. ¶¶ 26–28)); DOS Index nos. 23, 26, ECF No. 40-8 (DOS talking points on PPG). The government points to no case holding that the presidential-communications privilege protects any document remotely like the PPG.[22] And expanding the privilege to protect documents like the PPG would effectively allow the President to promulgate "secret law." *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29 (concluding that the presidential-communications privilege did not apply to a presidential policy directive on global development because, among other things, it would "permit[ the President] to convey orders throughout the Executive Branch without public oversight—to engage in what is in effect governance by 'secret law'" (citation omitted)).

Third, and relatedly, insofar as the PPG includes legal and policy standards governing the use of lethal force, the PPG constitutes "working law" that cannot be withheld under Exemption 5. As the Second Circuit has emphasized, FOIA affirmatively requires the government to disclose "statements of policy and interpretations which have been adopted by [an] agency" and "instructions to staff that affect a member of the public," 5 U.S.C. § 552 (a)(2). *See Brennan Ctr.*, 697 F.3d at 201; *see also Sears*, 421 U.S. at 153 ("Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy . . . ." (quotation marks omitted)); *see also supra* § I.B. As explained above, the PPG

---

[22] The ACLU is not aware of any case holding that a final statement of law or policy is protectable under the presidential-communications privilege, and the government cites none. *Compare Ctr. for Effective Gov't v. DOS*, 7 F. Supp. at 27 (rejecting application of the privilege to a presidential policy directive), *with, e.g.*, *Nixon*, 418 U.S. at 688 (applying the privilege to "tapes, memoranda, papers, transcripts or other writings relating to certain precisely identified meetings between the President and others"); *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (similar); *Loving*, 550 F.3d at 39–40 (same as to recommendations to the President concerning presidential review of a service member's capital sentence); *In re Sealed Case*, 121 F.3d at 752 (same as to "documents . . . generated in the course of advising the President in the exercise of his appointment and removal power"); *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (same as to records that "memorialize communications between senior presidential advisers and other United States government officials").

includes both law and policy that bind executive-branch agencies and actors. As a result, the government cannot invoke Exemption 5 (and, specifically, the presidential-communications privilege) to withhold those portions of the document.

Finally, as discussed above, *see supra* § I.A, legal and policy standards cannot be withheld under Exemptions 1 or 3 unless they are inextricably intertwined with properly classified facts. The government asserts that "portions" of the PPG may be withheld under Exemption 1 because they are classified. Gov't Br. 12–13; *see* Lewis Decl. ¶¶ 18–19.[23] However, nothing in the government's public declarations explains, even in broad terms, the kinds of intelligence sources and methods or military plans that might be contained in the PPG. Given the nature of the PPG—a document that purportedly establishes legal and policy standards governing the targeted-killing program generally, rather than one that applies such standards in a specific case—it is difficult to understand why such details would be found in the document.

In any event, even if the PPG contains properly classified facts, the crucial question is whether the legal and policy standards sought by the ACLU can be segregated from these facts. Here, it is plain that the government could easily segregate the legal and policy standards from properly withheld information. Indeed, the government has already done part of the job, because, as the government acknowledges, the May 2013 Fact Sheet reflects at least some of the contents of the PPG. *See* Lewis Decl. ¶ 20 ("Parts of this document have been publicly acknowledged in a Public Fact Sheet."). Moreover, the Report on Process contains discussions of the PPG's legal and policy standards alongside other redacted material. *See* Report on Process 1–4. At the very least, the May 2013 Fact Sheet and the Report on Process show that portions of the PPG can be

---

[23] DOD identified the PPG as an agency record. *See* Lewis Decl. ¶ 17. Presumably, OLC also has a copy of the PPG, as it invokes the presidential-communications privilege over it. *See* Bies Decl. ¶ 54. It is unclear from the CIA's public filings whether it acknowledges having a copy.

segregated and released to the public. These documents are brief summaries of the legal and policy standards in the PPG, but the government can almost certainly release more information about those standards without harming the interests protected by Exemptions 1 and 3. As discussed above, the government has segregated legal analysis from properly withheld information on many previous occasions. *See supra* § I.A. Public statements by government officials have disclosed the legal analysis underlying the PPG, including the constitutional and statutory basis for the targeted-killing program, and the administration's view of international human rights law and international humanitarian law. *See* ACLU Br. 14–15; *see* Waiver Table at 1–18. It is simply not plausible that the government is unable to disclose the portions of the PPG that contain effective legal and policy standards, as FOIA requires, *see* 5 U.S.C. § 552 (b).

### III.   The government has not justified the redactions of legal and policy standards from the DOD Reports.

Like the PPG, the DOD Reports must be disclosed to the extent they include legal and policy standards. The government invokes Exemption 1 to justify the withholding of the DOD Reports, but Exemption 1 does not authorize the withholding of legal standards as such. For the same reasons discussed above, the relevant question here is whether the legal standards are inextricably intertwined with properly classified facts.

It is clear from the government's declarations that the DOD Reports include legal standards. One report—the Report on Associated Forces—discusses the "definitions and the process to determine if an entity is an affiliate, associated force, and/or adherent of al Qaeda or the Taliban." Lewis Decl. ¶ 11. The other—the Report on Process—"provide[s] an explanation of the legal and policy considerations and approval process used in determining whether an individual or group of individuals could be a target of a lethal or capture operation . . . outside of the United States and outside of Afghanistan." *Id.* Unless they are inextricably intertwined with

properly classified facts, the legal and policy standards contained in the two DOD Reports must

be released. Legal and policy standards in this context would include:

- identification and discussion of "Alternative Legal Authorities," in addition to the Authorization for Use of Military Force, Pub. L. No. 107–40, 115 Stat. 224 (2001), and Article II of the Constitution, under which the government operates the targeted-killing program, *see* Report on Associated Forces 3–4;

- the definitions of, and legal and policy analysis relating to, "Associated Forces," "Other al-Qa'ida Affiliates" and "Other Notable Terrorist Groups," *see* Report on Associated Forces 1 n.1, 2–3;[24]

- the definition of the term "imminent threat" as it applies to targeted killing, *see* Report on Process 3–4;

- the criteria by which the government evaluates the feasibility of capture, *see* Report on Process 4; and

- the criteria by which the government determines whether there is "near certainty that the identified target is present" and "near certainty that non-combatants will not be injured or killed," *see* Report on Process 4–5.

The government's reliance on Exemption 1 to justify the redactions in the two DOD

Reports is improper. The government cites Exec. Order 13526 § 1.4(a), which allows for the

classification of "military plans, weapons systems, or operations"; it argues that this part of the

Executive Order authorizes the government to classify "the process for determining whether

groups of individuals are proper targets [for] lethal or combat operations." Lewis Decl. ¶ 16. But

while the language of section 1.4(a) plainly covers the military's process for selecting among

lawful targets, it cannot be stretched to cover the standards by which the military decides which

targets are lawful ones. Legal standards cannot reasonably be described as "military plans" or

"operations"—let alone as "weapon systems."

---

[24] To be clear, the ACLU does not seek a listing of "Other al-Qa'ida Affiliates" and "Other Notable Terrorist Groups" redacted from the Report on Associated Forces. *See* Report on Associated Forces 2–3. Rather, it seeks the legal and policy standards by which the government decides whether to include of groups in these categories.

The government also errs in arguing that disclosure of more information from the two DOD Reports would "assist adversaries in avoiding justice" and "afford an operational advantage to those groups." Lewis Decl. ¶ 16. Plaintiffs do not dispute that the disclosure of military plans or operations could result in the harms the government wants to avoid. But, again, the ACLU is not asking the government to disclose that information. It is asking the government to disclose legal and policy standards—and only insofar as those standards can be extricated from military plans or operations.

Here, as with the PPG, *see supra* §§ I.A & II, the relevant question is one of segregation. And here, as with the PPG, there is evidence that the government's redactions are overbroad. Unredacted text in the Report on Process, for example, states that the government may conduct lethal operations only when a "proposed target poses a continuing, imminent threat to U.S. persons." Report on Process 3. Immediately after that unredacted passage, however, are three and a half redacted paragraphs that appear (from context) to explain what the government means by "continuing, imminent threat." *See id.* at 3–4. If this is indeed what the government has redacted, it has redacted not properly classified facts but discussion of a legal standard. Similarly, the redaction of the "Alternative Legal Authorities" on which the government relies to detain and target terrorism suspects, Report on Associated Forces 3–4, appears to relate to legal standards, not properly classified facts.

## IV.   The government must release those parts of the legal memoranda that contain information or analysis the government has disclosed in other contexts.

### A.   The Second Circuit has instructed that official acknowledgment under FOIA does not require a precise "match" between the information the government seeks to withhold and the information it has previously disclosed.

Under the doctrine of official acknowledgment, the government cannot withhold information unless it is materially different from information the government has publicly

disclosed in other contexts. *See N.Y. Times*, 756 F.3d at 114, 120; *see also* ACLU Br. 7–10. The

relevant question here is whether, in light of all the information the government has already

released concerning the targeted-killing program, "additional" disclosure of responsive

information "adds [anything] to the risk" of harm to an interest still protected by one of FOIA's

exemptions. *N.Y. Times*, 756 F.3d at 120. The government asserts that the official-

acknowledgement doctrine applies only "if the *same* information has been the subject of a

prior . . . disclosure," Gov't Br. 29 (emphasis added), insisting that the D.C. Circuit has recently

said that the official-acknowledgment test has a kind of "matching requirement," Gov't Br. 29

n.7. But it is the Second Circuit's law that governs here—and the Second Circuit has already

rejected the argument the government makes here. *N.Y. Times*, 756 F.3d at 120. Indeed, as the

ACLU has previously explained, had the Second Circuit applied the purported "matching

requirement" in *N.Y. Times*, it could not have ordered the government to disclose substantial

portions of the July 2010 OLC Memo discussing 18 U.S.C. § 956(a). *See* ACLU Br. 9–10

(explaining that the government's previous public analysis of the statute was limited to a single

footnote in the November 2011 White Paper); *see also N.Y. Times*, 756 F.3d at 116.[25]

    **B.**    **Information that the government has officially acknowledged cannot be withheld under *any* of FOIA's exemptions.**

       It is beyond dispute that "[v]oluntary disclosures of all or part of a document may waive

---

[25] This Court has previously criticized the ACLU's argument with respect to the "matching requirement" as "overbroad," *ACLU v. DOJ*, No. 12 Civ. 794, 2015 WL 4470192, at *4 (S.D.N.Y. July 16, 2015), but the Court misapprehended the ACLU's argument. The ACLU does not contend that "official acknowledgement of a particular fact . . . waives FOIA exemptions for *all details*" related to that fact, *id.* (emphasis added). Rather, the ACLU argues that the government cannot withhold information here unless it is *materially different* from information the government has publicly disclosed in other contexts. *See* ACLU Br. 7; *see also Afshar v. DOS*, 702 F.2d 1125, 1132 (D.C. Cir. 1983) (framing official-acknowledgment inquiry as whether the withheld information was "in some *material respect* different from" publicly disclosed information (emphasis added)).

an otherwise valid FOIA exemption," including Exemption 5. *N.Y. Times*, 756 F.3d at 114. Here, however, the government argues that even if it has disclosed legal analysis written in relation to the targeted-killing program, it can withhold memoranda that include the *same* legal analysis if the memoranda were written in different contexts. *See* Gov't Br. 30. This argument, which would gut the official-acknowledgement doctrine, should be rejected.

As a general matter, the government's official disclosure of legal analysis waives the government's right to withhold that legal analysis—period. The government may lawfully withhold legal analysis that it has already officially disclosed in another context only if releasing that analysis in a new context would disclose a properly classified fact that has not already been disclosed. *See, e.g.*, *N.Y. Times*, 756 F.3d at 119 ("recogniz[ing] that in some circumstances the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that operation"). Indeed, to hold that the waiver associated with official acknowledgement applies only to legal analysis written in "the same context" would radically constrict the official-acknowledgement doctrine, because no two documents are ever created in exactly the same context.

Adopting the government's view would also require rejecting the Second Circuit's analysis in *N.Y. Times*. When the Second Circuit held that the government had waived its right to withhold much of the July 2010 OLC Memo addressing the legality of targeting Anwar al-Aulaqi with lethal force, the court did not look only to the government's disclosure of analysis from that memorandum in particular—or even to the government's disclosure of analysis relating to al-Aulaqi in particular. It looked to disclosures made in "other contexts." For example, it looked to the November 2011 White Paper (which contained generally applicable legal analysis), to public speeches that never referenced al-Aulaqi, and to testimony to Congress by high-ranking officials

about legal advice unconnected to al-Aulaqi. The government contends that the Second Circuit

found waiver relating to "the context of an operation against [Anwar al-]Aulaqi," Gov't Br. 30,

but this simply does not jibe with what the court actually did. In fact, the court found that the

government had waived its right to withhold legal analysis closely related to the analysis it had

already disclosed—even though the analysis the government sought to withhold related to al-

Aulaqi in particular and most of its previous disclosures related to the targeted-killing program

generally.[26]

> ### C.   This Court's waiver analysis should not disregard unambiguous statements by members of Congress and cleared statements by former high-ranking officials.

In an effort to minimize a handful of specific acknowledgments listed in the Waiver

Table, the government contends that "statements by members of Congress" and "statements by

former agency officials" should have no bearing on the Court's waiver analysis in this case.

Gov't Br. 34.[27] The government is mistaken.

The touchstone for official acknowledgment is whether the disclosure in question leaves

"some increment of doubt," or whether, by contrast, it will be understood as reliable, credible,

and official. *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009); *see Gardels v. CIA*, 689 F.2d

1100, 1105 (D.C. Cir. 1982) ("Official acknowledgement ends all doubt . . . ."); *see also United

States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972) ("Rumor and speculation are not the

---

[26] The Second Circuit's recent opinion in *N.Y. Times II* is not to the contrary. There, the court rejected the ACLU's waiver argument with respect to a 2002 OLC memorandum "concern[ing]" Executive Order 12,333 because the relevant waivers had taken place after "the passage of a significant interval of time" and "concern[ed] actions and governing legal standards different from those later publicly discussed." *See* 2015 WL 7423815, at *3.

[27] Perhaps intending to blur the grounds of the official acknowledgments listed in the Waiver Table, the government also asserts that "statements in press reports that are either unattributed or attributed to unnamed sources" cannot effectuate official acknowledgments. Gov't Br. 34. The government does not identify which of the disclosures listed in the Waiver Table are comprised of such statements—and indeed it cannot do so, because *none* of them fall within that category.

equivalent of prior disclosure, however, and the presence of that kind of surmise should be no reason for avoidance of restraints upon confirmation from one in a position to know officially."). In other words, the question is whether the disclosure comes from "'*one in a position to know of it officially*,'" *ACLU v. DOD*, 628 F.3d 612, 622 (D.C. Cir. 2011) (emphasis added) (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)); *see Schlesinger v. CIA*, 591 F. Supp. 60, 66 (D.D.C. 1984) (defining "official disclosures" as "direct acknowledgments by an authoritative government source").

While it is generally true that statements made by legislators or former agency officials are insufficient to effect official acknowledgement, *see, e.g.*, *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), the categorical rule suggested by the government here and elsewhere is not the law.[28] Indeed, the D.C. Circuit has explicitly eschewed such a construction of the official-acknowledgment doctrine. *See Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (expressly declining to reach the question whether members of Congress can effect official acknowledgments); *see also Hoch v. CIA*, No. 88-5422, 1990 WL 102740, at *1 (D.C. Cir. July 20, 1990) (per curium) ("We cannot so easily disregard the disclosures by congressional committees. . . . This circuit has never squarely ruled on this issue, but we need not do so to decide this case." (footnotes omitted)). And recently, in *Ameziane v. Obama*, 699 F.3d 488 (D.C. Cir. 2012), a court rejected the notion that official acknowledgments may emanate only from the executive branch. *See id.* at 492–93 (finding that both the district court and a Guantánamo

---

[28] *See* Jack Goldsmith, *The Significance of DOJ's Weak Response to Rogers' Acknowledgment of CIA Drone Strikes*, Lawfare (Feb. 15, 2013, 10:09 AM), https://www.lawfareblog.com/significance-dojs-weak-response-rogers-acknowledgment-cia-drone-strikes (characterizing as "weak" the government's argument, in a Rule 28(j) letter to the D.C. Circuit, that disclosures of officials of coordinate branches cannot accomplish official acknowledgements, and observing that the cases cited by the government "do not stand for the proposition" for which the government cites them).

26

detainee's lawyer could be sources of official acknowledgment). Other courts have held that even *private* actors may make official acknowledgments of "state secrets" when they are "considered reliable because they come directly from persons in a position to know whether or not the supposedly covert activity is taking place." *Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899, 913 (N.D. Ill. 2006) (citing *Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974, 993 (N.D. Cal. 2006)).

In *N.Y. Times*, the court expressly considered statements of Senator Dianne Feinstein, then–Chairman of the Senate Select Committee on Intelligence, and Representative Mike Rogers, then–Chairman of the House Select Committee on Intelligence, in its analysis of whether the CIA had an operational role in the targeted-killing program. *See* 756 F.3d at 119. Though the court stopped short of calling those statements "official acknowledgments," it did not shut its eyes to their implications. Instead, it emphasized that the statements allowed the court to "be confident" that neither intelligence-committee chairman "thought they were revealing a secret when they publicly discussed CIA's role in targeted killings by drone strikes." *Id.* at 119. Similarly, the court explained that "[e]ven if" other statements made by executive-branch officials did not qualify as "official acknowledgments," those statements "establish the context in which" other official acknowledgments "should be evaluated." *Id.* at 115. The Second Circuit's approach—in essence, a refusal to engage in a legal fiction propagated by the government—was sound. *Cf. ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013) ("'There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women. We are at that point with respect to the question of whether the CIA has any documents regarding the subject of drone strikes." (second alteration in original) (quoting *Watts v. Indiana,* 338 U.S. 49, 52 (1949) (opinion of Frankfurter, J.))). The disclosures made by the leaders of the congressional

intelligence committees are surely understood to be official by the general public, foreign governments, and enemies of the United States. Sen. Feinstein and Rep. Rogers were the chairpersons of the congressional committees that oversee the CIA, *see* 50 U.S.C. § 413b, and they made clear that they had first-hand information about the CIA's involvement in monitoring the agency's targeted-killing operations. The government cannot credibly contend that Senator Feinstein and Representative Rogers are uninformed, or even that they are perceived to be uninformed by the public. Nor can it plausibly argue that the public is likely to disregard their statements until and unless those statements are confirmed by executive-branch officials. In other words, Senator Feinstein and Representative Rogers are the quintessential "one[s] in a position to know . . . officially." *Alfred A. Knopf, Inc.,* 509 F.2d at 1370.

Moreover, none of the authoritative, unambiguous acknowledgments made by members of Congress listed in the Waiver Table, *see* Exhs. 19, 24, 25, 26, 29, 37, 38, 41, 44, 46, 47, are the lone, or even primary, acknowledgments of the propositions for which the ACLU put them forth. Even if the Court reads the law of official acknowledgment in this Circuit strictly and does not credit each of the statements as independent acknowledgments, the Court should—just as the Second Circuit did—consider them together, along with their implications, in conducting its waiver analysis.[29]

Similarly, the Court should not pretend—as the government asks it to do—that the CIA's former general counsel, John Rizzo, did not extensively discuss, in a memoir cleared by the CIA

---

[29] *See, e.g.*, Jack Goldsmith, *Thoughts on Today's Important Drone FOIA Oral Argument in DC Circuit*, Lawfare (Sept. 20, 2012, 6:34 AM), https://www.lawfareblog.com/thoughts-todays-important-drone-foia-oral-argument-dc-circuit ("If one considers the official statements that come close to the line . . . in combination with (a) the many purposeful leaks to the press by unnamed senior officials that contain many (often self-serving) details about CIA involvement in deploying drones, and (b) the many (un-denied and unpunished) overt statements by former officials about CIA involvement in the drone program (collected in the ACLU brief), the *only* reasonable conclusion is that the CIA is involved in the drone program.").

itself, the September 17, 2001 Memorandum of Notification ("MON") that authorized the CIA to take lethal action against suspected terrorists. *See* Waiver Table at 32–34; *see also* June 2007 Dorn Declaration (Spurlock Decl. Exh. 3, ECF No. 34-3); January 2014 Rizzo Book (Spurlock Decl. Exh. 35, ECF No. 34-35). It is indisputable that Mr. Rizzo would have intimate knowledge of the CIA's use of drones and the legal authority upon which it rests. He wrote for attribution, and his book offered unambiguous confirmation of facts that the American public, allies, and enemies alike could not treat as anything other than authoritative. The CIA itself, apparently, did not believe that the publication of Rizzo's book would damage national security. *See* January 2014 Rizzo Book at copyright page (Second Spurlock Decl. Exh. 53) ("The material has been reviewed by the CIA to prevent the disclosure of classified information."); *see Snepp v. United States*, 444 U.S. 507, 513 n.8 (1980) (explaining that the prepublication-review procedure is intended to "to ensure in advance, and by proper procedures, that information detrimental to national interest is not published" (emphasis removed)); *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983) (explaining that prepublication review "alleviates a former agent's fear that his disclosure of non-sensitive information might result in liability" for the disclosure of classified information). His statements, therefore, should bear weight in the Court's analysis.[30]

### D. The government's efforts to minimize the effect of official acknowledgments in this case are unpersuasive.

Finally, the government challenges various official acknowledgments proffered by the ACLU in its opening brief and Waiver Table, *see* Gov't Br. 35–42.[31] However, the government's

---

[30] The government's insistence that Mr. Rizzo's statements about the MON should be disregarded is particularly unpersuasive given that the government itself has acknowledged the existence of the MON in litigation in this Court. *See* June 2007 Dorn Declaration.

[31] The government does not contest that some of the information cited in the Waiver Table has been officially acknowledged. For example, the government does not dispute that it conducts drone strikes in Somalia. *See* Gov't Br. 39. And although the government asserts that official

arguments are an unavailing attempt to convince the Court to grant its "imprimatur to a fiction of deniability that no reasonable person would regard as plausible," *ACLU v. CIA*, 710 F.3d at 431; *see id.* ("'There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women." (first alteration added) (quoting *Watts*, 338 U.S. at 52 (opinion of Frankfurter, J.))). For example, the government disputes that government officials have officially acknowledged that:

- **the government conducts targeted killings in Pakistan, including through the use of drones.** Three statements—the August 2013 Kerry Statement, the June 2012 Carney Statement, and the May 2009 Panetta Speech—make unequivocally clear that the government conducts targeted killings in Pakistan. *See* Waiver Table at 25–26. As the Second Circuit explained last year in connection with statements by the chairs of the congressional intelligence committees that confirmed the CIA's role in the targeted-killing program, "we can be confident that" the Secretary of State, speaking *in* Pakistan, *about* Pakistan, did not think he was "revealing a secret when" he stated that the targeted-killing program there was "on a good track" and "w[ould] end" soon, *N.Y. Times*, 756 F.3d at 119. The government's argument that the Second Circuit made a "finding[]" with respect to these statements in *N.Y. Times*, *see* Gov't Br. 37, is without any basis (and, unsurprisingly, lacks any citation), as the acknowledgment issue with respect to Pakistan was not relevant to the court's resolution of the case.

---

statements regarding before- and after-the-fact analysis and civilian casualties are narrower than the ACLU's characterizations, it merely repeats the ACLU's citations, with no rebuttal or argument in support of an alternate interpretation of clear official statements waiving any privilege with respect to those facts. *See* Gov't Br. 41–42 (before- and after-the-fact analysis); Waiver Table at 35–40 (same); Gov't Br. 42 (civilian casualties); Waiver Table at 40 (same).

- **the CIA in particular conducts targeted killings in Pakistan, including through the use of drones.** Both the June 2010 Panetta Interview (in which the then–CIA Director discussed the CIA's "aggressive operations" in Pakistan) and the May 2009 Panetta Speech (in which the Director discussed the CIA's conduct of drone strikes in Pakistan) establish this fact. *See* Waiver Table at 26–27. Moreover, Panetta expressly acknowledged in a recent documentary film that the CIA conducted drone strikes in Pakistan during his tenure at the head of the agency. *See* Chris Whipple, *'The Attacks Will Be Spectacular'*, Politico, Nov. 12, 2015 ("November 2015 Panetta Statement") (Second Spurlock Decl. Exh. 54).[32] As above, the government's contention that the Second Circuit "declined" to find this fact in *N.Y. Times*, Gov't Br. 37, is baseless—the nature of the CIA's role in targeted killings, let alone in Pakistan, was not relevant to the court's decision as the court itself pointedly stated. *See N.Y. Times*, 756 F.3d at 122 n.22 ("For purposes of the issues on this appeal, *it makes no difference whether* the drones were maneuvered by CIA or DOD personnel so long as CIA has been disclosed as having some operational role the drone strikes.").

- **the government conducts targeted killings in Yemen, including through the use of drones.** Incredibly, the government asks the Court to accept that—despite the Second Circuit's decision in *N.Y. Times*, two official White House reports, and the June 2015 White House Statement, *see* Waiver Table at 27—the targeted killing of Anwar al-Aulaqi was the United States' only targeted killing in the country. *See* Gov't Br. 38. Never mind

---

[32] This disclosure was published after the ACLU filed its opening brief. Following both the Second and D.C. Circuits, the Court should take judicial notice of the disclosure because it "'go[es] to the heart of the contested issue,' and . . . [is] inconsistent with some of [the government's] prior claims." *N.Y. Times*, 756 F.3d at 110 n.8 (quoting *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1243 (D.C. Cir. 1991)); *see ACLU v. CIA*, 710 F.3d at 431.

the fact that the government has accepted responsibility for the drone strike that, two weeks after this supposed "lone" strike, killed Anwar's son, Abdulrahman. *See N.Y. Times*, 756 F.3d at 111. The government's argument is simply not plausible.

- **the CIA in particular conducts targeted killings in Yemen, including through the use of drones.** The government contends that while the Second Circuit determined "that CIA had an operational role in drone strikes generally," it did not find an officially acknowledged connection between the CIA and targeted killings in Yemen. Gov't Br. 38–39. But the Second Circuit *did* find that the CIA had an operational role in the al-Aulaqi strike, and it observed that the al-Aulaqi strike had taken place in Yemen. *See N.Y. Times*, 756 F.3d at 119. Moreover, the May 2011 White Paper specifically contemplated the CIA's legal authority to use lethal force in Yemen. *See* Waiver Table at 28 (discussing the May 2011 White Paper and other acknowledgments).

- **a September 17, 2001 Memorandum of Notification signed by President Bush authorizes the CIA to take lethal action against suspected terrorists.** The government does not deny the existence of the MON—and given that it acknowledged the document eight years ago in litigation with the ACLU, *see* June 2007 Dorn Declaration, it cannot— but instead disputes that the government has acknowledged that the MON authorized targeted killing. But as discussed above, former CIA General Counsel John Rizzo acknowledged the connection between the MON and targeted killing in a memoir that was subject to review by the CIA before publication. *See supra* § IV.D. Even if the Court is disinclined to view Rizzo's acknowledgment as "official," it should—following the Second Circuit's example in *N.Y. Times*—read Rizzo's acknowledgement as

"establish[ing] the context in which" other acknowledgments must be read, 756 F.3d at

115.

## CONCLUSION

For the reasons given above and in the ACLU's opening brief, the ACLU respectfully

asks that the Court review some of the withheld records *in camera* to determine whether they are

in fact protected by the exemptions the government cites. More specifically, the ACLU asks that

the Court review *in camera* (i) the PPG; (ii) the DOD Reports; and (iii) a sample of the final

legal memoranda.

Dated: December 1, 2015                     Respectfully submitted,

                                            */s/ Jameel Jaffer*
                                            Jameel Jaffer
                                            Hina Shamsi
                                            Brett Max Kaufman
                                            Matthew Spurlock
                                            American Civil Liberties Union Foundation
                                            125 Broad Street—18th Floor
                                            New York, New York 10004
                                            T: 212.549.2500
                                            F: 212.549.2654
                                            jjaffer@aclu.org

                                            *Attorneys for Plaintiffs*