UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

AMERICAN CIVIL LIBERTIES
UNION and THE AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,

        Plaintiffs,

      -against-

DEPARTMENT OF JUSTICE, et al.,

        Defendants.

—————————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/4/16

15 Civ. 1954 (CM)

## MEMORANDUM ORDER DIRECTING PRODUCTION OF DOCUMENTS FOR IN CAMERA REVIEW

McMahon, J.:

      This memorandum order is issued so that the court can complete work on its

decision on the parties' pending cross motions for summary judgment.

      For the reasons stated below, the Government is directed to produce OLC

Document 306 and DoD Documents 7 and 8 for in camera review no later than March 4,

2016.

**OLC 306**

      OLC (Office of Legal Counsel, Department of Justice) Document 306 is known to

the parties as the "Presidential Policy Guidance," or PPG. Its full name is the Procedures

for Approving Direct Action Against Terrorist Targets Located Outside the United States

and Area of Active Hostilities." According to the Government, the PPG is a classified (at

the TOP SECRET level), confidential communication from the President to certain

Executive Branch Agency and department heads, whose identities have not yet been
revealed to the court.

The PPG has been withheld in part under Exemptions 1 and 3, on the ground that
the information contained in portions of the document therein is properly and presently
classified (Exemption 1) and that the disclosure of portions of the document would
violate the National Security Act (Exemption 3) by disclosing intelligence sources and
methods  Although it appears to be a final policy document, it has been withheld on the
grounds of attorney-client privilege and deliberative privilege as well – but only as to
OLC's copy. The Government does not claim that copies of the PPG that were sent to
other Executive Branch agencies are exempt from disclosure under Exemption b(5) due
to either attorney-client privilege or deliberative privilege.[1]

The entire PPG has been withheld pursuant to the "presidential communications"
privilege.

The Government has already publicly disclosed, in a "Fact Sheet" that was
released in May 2013 (Spurlock Ex. 33), certain information contained in the PPG. The
Fact Sheet, which bears the official title, "U.S. Policy Standards and Procedures for the
Use of Force in Counterterrorism Operations Outside the United States and Areas of
Active Hostilities," is a fairly comprehensive outline of the procedures that the
Administration goes through and the factors it analyzes when deciding whether to target

---

[1] I am not sure I understand OLC's peculiar Exemption 5 privilege and deliberative process objections. If
OLC is suggesting that a final policy document is exempt under attorney-client privilege because one can
necessarily infer, from a final choice of policy, that the policy announced therein was the subject of
deliberation, or that OLC advised the President that the chosen policy was lawful, then it is unlikely to find
in this court a receptive audience, because under that kind of reasoning every final policy document would
qualify for the deliberative and attorney-client privileges. If OLC is announcing that this particular
document was transmitted to OLC so that OLC could give legal advice about future operations, then it is
coming perilously close to admitting that it constitutes "working law." If it is some other reason, I cannot
imagine what it might be.  Whatever, OLC's reasoning is unclear, and it needs to remedy that so the court
can rule on its unique objections.

for killing a terrorist suspect located outside this country but not in a so-called "hot war" zone. The Fact Sheet is not specific to any particular decision; it is more like a primer, or in legal terms, a hornbook or treatise, outlining considerations that would go into making a decision about whether to target a particular person or entity. In that, the Fact Sheet is not dissimilar from the document known as the "Draft White Paper," public disclosure of which caused the Second Circuit to conclude, in *New York Times Co., v. U.S. DOJ*, 756 F.3d 100 (2d Cir. 2014)(hereinafter NYT I), that the Government had waived all FOIA exemptions with respect to a document known as "the OLC-DoD Memorandum."

The Fact Sheet begins, "This document provides information regarding counterterrorism policy standards and procedures that are either already in place or will be transitioned into place over time."

The document articulates a preference for capturing rather than killing terrorist suspects, but indicates that capture operations "are conducted only against suspects who may lawfully be captured or otherwise taken into custody by the United States and only when the operation can be conducted in accordance with all applicable law and consistent with out obligations to other sovereign states."

It sets out certain standards for the use of lethal force in counterterrorism operations: it will not be pursued as punishment or as a substitute for prosecuting terrorists in a civilian court or military commission; it will be used only to prevent or stop attacks against U.S. Persons, and it will only be used when there are no other reasonable alternatives to address the threat effectively.

It announces that there must always be a legal basis for using lethal force, but does not further explain what legal bases would be applicable in making that decision. It

states that the United States will only use lethal force against a target that poses a continuing and imminent threat to U.S. Persons, but does not announce the standards for deciding whether a threat is either continuing or imminent.

It sets out five criteria that must be met before lethal action may be taken, which are designed to minimize the risks of mistake and collateral damage while implementing the preference for capture and the lack of reasonable alternatives.

Finally, the Fact Sheet explains that principles of international law and respect for the sovereignty of other states will factor into any decision to use lethal force in counterterrorism operations outside the United States.

The Fact Sheet announces that decisions concerning capture and/or use of lethal force against a counterterrorism target are to be made by unspecified senior Government officials, who will conduct a "broad analysis" of the intended target's "current and past role in plots threatening U.S. persons; relevant intelligence information the individual could provide; and the potential impact of the operation on ongoing terrorism plotting, on the capabilities of terrorist organizations, on U.S. foreign relations, and on U.S. intelligence collection." If the target is a U.S. person (such as Anwar Aulaqi), then as a matter of Administration policy the Department of Justice will conduct additional legal analysis in compliance with the Constitution and laws of the United States (presumably pursuant to the standards set out in the OLC-DoD Memorandum, although the Fact Sheet does not so state).

The Fact Sheet indicates that Congress will be kept informed about all such operations and approvals.

4

The Fact Sheet contains a great deal of information in just two and one half pages; frankly, it is difficult to fathom what it does not disclose that might be in the PPG. Nonetheless, the Government refuses to turn over the PPG. Since I can neither ascertain whether the presidential communications privilege actually protects the PPG nor determine whether public dissemination of the Fact Sheet waived the protection of any privileges without seeing the document, the Government is ordered to provide the court with the PPG, marked in accordance with the court's directions below, for in camera review.

The presidential communications privilege arguably dates back to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803), although it was largely dormant until resurrected in the litigation surrounding Richard Nixon and his refusal to provide certain tape recordings for use in connection with the criminal prosecution of Watergate defendants. *United States v. Nixon*, 418 U.S. 683 (1974); *Nixon v. Sirica*, 487 F. 2d 700, 717 (D.C. Cir. 1973); *see also, Nixon v. Administrator of General Services* (GSA), 433 U.S. 425 (1977). The privilege is discussed in great detail in a superbly informative opinion by The Hon. Patricia Wald of the District of Columbia Court of Appeals entitled *In re Sealed Case*, 121 F. 3d 729 (D. C. Cir. 1997). I cannot possibly improve on Judge Wald's discussion, so I simply adopt it (with one caveat, discussed below) as a statement of the law relating to the privilege. The following principles from *In re Sealed Case* seem to me relevant to the issue raised by the Government's assertion of the presidential communications privilege for the PPG:

1. The United States Supreme Court recognizes a privilege for presidential communications, founded on both the President's generalized interest in confidentiality and the need to guarantee the candor of presidential advisors and to provide the President and those who advise him with the freedom to

explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. *United States v. Nixon, supra.*, 418 U.S. at 708, 711.

2. Because the privilege is rooted in constitutional considerations – the separation of powers, the "unique constitutional role" of the President, and the deference afforded him by the other branches in the exercise of his Article II enumerated powers -- once the presidential communications privilege is claimed, the document to which the privilege arguably relates is presumptively privileged. *In re Sealed Case*, 121 F. 3d at 744. As with all presumptions, however, this one can be overcome; and the Government must convince the court that a particular document falls within the rather narrow parameters of that privilege before it will be deemed exempt from disclosure.

3. Although the privilege is the President's, he need not personally invoke it in order for the privilege to attach. *Citizens for Responsibiltiy & Ethics v. U.S. Department of Homeland Security,* 514 F. Supp. 2d 46, 48, n. 10 (D.D.C. 2007); *Electronic Privacy Info. Ctr. V. U.S. Dept of Justice,* 584 F. Supp. 2d 65, 80-81 (D.D.C. 2008). The President has not personally invoked the privilege in this case; however, I have no doubt that he would do so were it required by law. I thus consider this issue a red herring.

4. Even if the privilege attaches --- that is, even if the Government makes the showing contemplated by Paragraph 2 above -- it is a qualified, not absolute, privilege; it can be overcome by an adequate showing of demonstrated, specific need. *In re Sealed Case*, 121 F. 3d at 744, 746.

5. The privilege, like all privileges, can be waived and is waived by the disclosure of the otherwise privileged information to third parties. *In re Sealed Case*, 121 F. 3d at 741.

6. The privilege is distinct from and "affords greater protection against disclosure" than the deliberative process privilege, and can apply to final and post-decisional as well as pre-decisional and deliberative communications. *In re Sealed Case*, 121 F. 3d at 745-46.

7. Most important: the privilege "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision making process is adequately protected. Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege." *Id.* at 752. In Judge Wald's view, the privilege attaches to direct communications with the president and to communications made by his immediate advisors in the course of preparing advice for the President, even when not made directly to the President. *In Re Sealed Case*, 121 F. 3d at 751. It also extends to communications authored or received in response to a solicitation by the President or a member of the

6

>Presidential adviser's staff. *Id* at 752. However, it does not extend further; Judge Wald stated flatly, "In particular, the privilege should not extend to staff outside the White House in executive branch agencies." *Id.*

The only thing with which I might quarrel is the last statement (literally, the last sentence of Paragraph 7). At least where the President's Commander in Chief and War Powers are concerned, it is the opinion of this court that the privilege could attach to communications to and from very senior members of the Executive Branch in agencies outside the White House – most particularly to officials at the highest levels in the Departments of State and Defense, at the Joint Chief of Staff, at the National Security Council (including Principals and possibly Deputies), and the Central Intelligence Agency. Nonetheless, I agree with Judge Wald's general proposition that the circle within which the presidential communications privilege extends has a narrow diameter, and that the transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege.

*In re Sealed Case*, like *United States v. Nixon*, arose in the context of criminal investigation and prosecution, not a request under the Freedom of Information Act. A most informative opinion from the FOIA perspective was released several years ago by The Hon. Ellen Huvelle of the District of Columbia District Court, in a case called *Center for Effective Government v. U.S. Department of State*, 7 F. Supp 3d 16 (2013). In that case, the Plaintiff submitted requests for a document called the Presidential Policy Directive on Global Development to the State Department, which declined to produce it, citing, *inter alia*, the presidential communications privilege. The document, which (like the PPG in this case) emanted from the President – that is, it was a presidential directive, not a communication from an adviser to the president -- was initially transmitted to a

"limited group of senior foreign policy advisors, cabinet officials, and agency heads." It was to be further distributed by its initial recipients only on a "need to know" basis. Deciding who "needed to know" was the prerogative of the original recipients, and in the end the document was distributed far more widely. The document was not classified, which means that Judge Huvelle did not have to deal with the added complication of partial classification, which is very much present in this case (and the fact that the document was not classified proved very important to Judge Huvelle).

Judge Huvelle concluded, after reviewing the document in camera, that it was not protected by the presidential communications privileged. She noted the novelty of the question facing her, saying, "….never before has a court had to consider whether the [presidential communications] privilege protects from disclosure under FOIA a final, non-classified , presidential directive that has been distributed widely within the Executive Branch and serves as guidance for several policy-making bodies, including twenty-two Executive Branch agencies, as well as the {National Security Staff] and National  Security Council Deputies and Principal." *Center for Effective Gov't,*, 7 F. Supp. 3d at 23-24. Significantly for our purposes, she held the following, all of which seems perfectly reasonable to this court:

1. While the disclosure of some portions of a document that is subject to the presidential communications privilege does not automatically waive the privilege as to the entire document, where the document and its subject are widely publicized, even "touted" by the President, that public disclosure "is important in considering the confidentiality interest implicated by the directive's disclosure under FOIA.

2. The disclosure of a document beyond the limited circle of close presidential advisors and their staff identified in *In re Sealed Documents* – even  on a "need to know" basis -- did not implicate "the purposes that animate the privilege: the promotion of candor and effective presidential decision

making," and so undercut any suggestion that the document was privileged *as a presidential communication.*

3. The widespread dissemination of documents, to persons well beyond the circle of close presidential advisors, will eviscerate the presidential communications privilege even if the document in question was created by the President or at his direct behest. If a document authored by the President is transmitted to multiple agencies and to staffers who serve in non-advisory roles to the President, the document loses any claim to the presidential communications privilege. Judge Huvelle specifically rejected the Government's argument that the presidential communications privilege attaches to every communication that originates with or at the request of the President or one of his closest advisors. She characterized the Government's position that the President should be permitted to convey orders throughout the Executive Branch without public oversight as "cavalier" and a recipe for "engage[ing] in what is in effect governance by 'secret law'" -- a purpose strictly forbidden by Congress when it passed FOIA. *Center for Effective Government*, 7 Supp. 3d at 27-29.

4. Finally, Judge Huvelle recognized a difference between communications that are deemed privileged because of a "need to protect military, diplomatic, or sensitive national security secrets" and documents as to which the privilege attaches "solely on the broad, undifferentiated claim of public interest in the confidentiality of" the document. 7 F. Supp. 3d at 25 (quoting *Nixon, supra.*, 418 U.S. at 706). As her case fell squarely within the latter group, and as the document was not classified, its broad dissemination to persons who were not imvolved in advising the President, but in implementing his announced policy, eviscerated the presidential communications privilege.

I can see nothing to quarrel with in Judge Huvelle's reasoning, either. It is with this law in mind that I address the question of whether the Government needs to produce the PPG for in camera review. The answer is obvious: yes, it must.

The court bears in mind that the document is partly classified and may include information the revelation of which would violate the National Security Act's prohibition on the disclosure of intelligence secrets and methods. But the Government admits that only portions of the document fall within FOIA Exemptions (b)(1) and (b)(3). As for the rest, it is certainly possible that the claimed privilege applies. But the court does not

know how widely the document has been distributed, or to whom, or for what purposes it
has been used. I do not know whether any part of it (including any classified portion)
closely tracks the information that was disclosed in the Fact Sheet – in which case, there
may be portions of the document that must be disclosed because all privileges and FOIA
exemptions have been waived. I do not know, and I cannot tell from the Classified
Vaughn Index, whether the PPG contains additional information that, while not
classified, would have some bearing on presidential decision-making on counterterrorism
issues – issue that, unlike those at stake in Judge Huvell's case, involve military and
diplomatic plans and secrets, an arena in which the presidential communications privilege
is undoubtedly more robust, and which might justify disclosure that exceeded the bounds
outlined by Judge Wald in *In re Sealed Case*. In short, there's a lot I don't know about
the PPG.

The situation in which I find myself with regard to the PPG is no different than
the situation in which the Second Circuit found itself in *NYT I*.[2] There, a document
containing legal analysis (the OLC-DoD Memorandum) was withheld from production
on multiple grounds. A document summarizing portions of the contents of the withheld
document (the Draft White Paper) was leaked to NBC News. In light of the facts on the
ground, the Court of Appeals demanded production of the OLC-DoD Memorandum for
in camera review, and eventually ordered its production to the New York Times and the
ACLU (with redactions) on the ground that all privileges and exemptions relating to legal
advice on the issue of the targeted killing of U.S. persons had been waived. So too here:
the PPG (a final policy directive from the President himself) is being withheld, and a

---

[2] I did not find myself in the same position because the Draft White Paper was not released until some
weeks after this court issued its first decision in *New York Times* .

document purporting to summarize at least part of its contents was released by the White House to the public in an admitted effort at transparency. The only way to determine whether the Government (1) has a viable claim of presidential communications privilege, and (2) to what extent if at all that privilege may have been waived, is to examine the document.

The Government should produce the document in a form that indicates which portions are classified and which are not; which portions are subject to Exemption (b)(3) and which are not. The Government should also highlight the information in the PPG that is disclosed in the Fact Sheet. And the Government should advise the court of who has received the PPG (including persons who received it from its original recipients) and for what purpose.

The Government has five business days to produce the document.

**The DoD Reports**

Documents 7 and 8 on the DoD Classified Vaughn Index are two reports that the Defense Department prepared at the request of Congress to brief the legislative branch on (1) definition and the process to determine if an entity is an affiliate, associated force and/or an adherent of al Queda or the Taliban; and an assessment of the groups or entities that the Department considers to be affiliated off adherents of al Queda" (Report on Associated Forces, DoD 7); and "an explanation of the legal and policy considerations and approval process used in determining whether an individual or group of individuals could be the target of lethal operations or capture operations conducted by the Armed Forces of the United States outside the United States and outside Afghanistan." (Report on Proces for Determining Targets of Lethal or Capture Operations, DoD 8). These

reports were originally classified Top Secret/No Forn and were provided to Congress on that basis. Portions of the reports have subsequently been unclassified and released publicly; the released portions of the documents are in the record on the motion for summary judgment as Spurlock Exs. 51 and 52. The Government asserts that the redacted portions of the Reports are exempt pursuant to Exemption (b)(1), due to the classified nature of the redacted material.

DoD Document 7, the Report on Associated Forces (Spurlock Ex. 51, in redacted form), advises Congress of which forces are considered by the Department of Defense to be "associated forces" or "affiliates" of Al-Queda or the Taliban – the former being the entity that carried out the World Trade Center attack that occasioned the AUMF, the latter being the entity that governed Afghanistan when that country provided aid and succor to Osama Bin Laden, the leader of Al-Queda. The document reveals that the concept of "associated force" is a legal concept, whereas the concept of "affiliate" is an intelligence concept. Except for Al-Queda in the Arabian Peninsula (AQAP), the identity/ies of any associated forces or affiliates that are identified in the document is/are redacted. It is not clear from the redacted document whether the redactions contain any discussion about how the assessment that any particular entity is an associated force or an affiliate were made. No information about the identity of any associated force or affiliate, and no information about how any assessment of any specific group was made, is disclosed in the Fact Sheet, and so has not been officially acknowledged.

Exhibit 51 contains a second report, the Report on Congressional Notification of Sensitive Military Operations and Counterterrorism Operational Briefings. The identity/ies of any such operation(s) was/were not disclosed in the Fact Sheet and so have

12

not been officially acknowledged. It is apparent from reading the redacted version of the document that at leas some of the redactions relate to the contents of the PPG.

DoD Document 8, the Process Report, briefs Congress on the manner in which the Department of Defense implements the PPG. The Defense Department's implementation of the PPG is not disclosed by the Fact Sheet. It is apparent from reading the redacted version of the Process Report (Spurlock Ex. 52) that everything that has not been redacted appears either in the Fact Sheet (*in haec verba,* no less) or in the OLC-DoD Memorandum's discussion of the legal considerations applicable to taking direct action against suspected terrorists outside of the United States. Everything that is redacted, by contrast, could conceivably relate to the contents of the PPG.

Since the court's determinations about the PPG will in large measure (if not entirely) dispose of the issue of the fate of these two documents, they must be produced for in camera review. Classified portions should be clearly identified as such.

The court will issue a short form order directing that the documents be produced for in camera review; that order will appear on the public docket. That will give the ACLU notice of the court's order. The court believes that this entire order should be deemed unclassified – as far as I can tell it contains not a scintilla of classified information -- but I will file the long-form order under seal and give the Government five business days – no more – to advise me whether any material needs to be redacted. If I do not hear about any proposed redactions within five business days, I will release this order for publication on ECF.

Date: February 25, 2016

U.S.D.J.

TRANSMITTED BY HAND TO
Sarah Normand, Assistant United States Attorney
FILED UNDER SEAL

14