**JAMEEL JAFFER**
*DEPUTY LEGAL DIRECTOR*



April 13, 2016

**BY ECF**

Hon. Colleen McMahon
United States District Judge
Daniel P. Moynihan United States Courthouse
500 Pearl Street, Room 1640
New York, New York 10067

Re:     *ACLU v. DOJ*, No. 15 Civ. 1954 (CM)

Dear Judge McMahon:

**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2654
WWW.ACLU.ORG

**OFFICERS AND
DIRECTORS**
SUSAN N. HERMAN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

ROBERT B. REMAR
*TREASURER*

We write respectfully on behalf of the American Civil Liberties Union and American Civil Liberties Union Foundation to bring to the Court's attention remarks made by President Obama at the University of Chicago Law School on April 8, 2016. A transcript of the president's remarks and the question-and-answer session that followed is attached.

Following his official remarks, in response to a question about the legality of the targeted-killing program, President Obama discussed the Central Intelligence Agency's operational role in the program. *See, e.g.*, Tr. at 26 ("[T]his drone program initially came through the intelligence side under classified programs, as opposed to the military."); *id.* at 25 (explaining that "decision-making" in the early years of the drone program "was embedded in decisions that are made all the time about . . . an intelligence team trying to take out a terrorist"); *id.* at 28 ("I think the way that [the drone program] got built up through our intelligence and what's called our Title 50 programs meant that it . . . wasn't subject to the same amount of democratic debate as when we are conducting what are called Title 10 Department of Defense conventional operations."); *see generally id.* at 24–28.

President Obama's acknowledgment that the CIA conducts drone strikes is the latest in a series of official acknowledgments concerning the intelligence agency's operational role in targeted killings. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. at 15 (S.D.N.Y. Aug. 28, 2015), ECF No. 33; Waiver Table at 20–25, 26–27, 28–29, 32–33 (S.D.N.Y. Aug 28, 2015), ECF No. 33-1.

Respectfully submitted,

/s/ Jameel Jaffer_____
Jameel Jaffer
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004

T: 212.549.2500
F: 212.549.2654
jjaffer@aclu.org

*Counsel for Plaintiffs*



*the* WHITE HOUSE



# Briefing Room

Your Weekly Address

**Speeches & Remarks**

Press Briefings

Statements & Releases

White House Schedule

Presidential Actions

    Executive Orders

    Presidential Memoranda

    Proclamations

Legislation

    Pending Legislation

    Signed Legislation

    Vetoed Legislation

Nominations & Appointments

Disclosures

---

**The White House**
Office of the Press Secretary

For Immediate Release            April 08, 2016

---

# Remarks by the President in a Conversation on the Supreme Court

# Nomination

University of Chicago Law School
Chicago, Illinois

2:43 P.M. CDT

PROFESSOR STRAUSS:  Well, Mr. President, it's a tremendous honor for the University and the law school.  Welcome back.

THE PRESIDENT:  It is good to be back.  (Applause.)  It is good to be back.  As some of you may know, I actually spent 10 years teaching classes and seminars here, and it was really fun. (Laughter.)  And I missed it.  And I thought, well, why don't I come back and say hi to everybody.

So there are a couple of people I want to acknowledge because they helped to facilitate this.  First of all, I want to thank Dean Miles for closing down the school, I guess, for a day. (Applause.)  Thank you.  Special acknowledgements for Geoff Stone and Doug Baird, who were great friends when I was teaching here and were partly responsible for having me actually take on some responsibility straight out of law school to mold the minds of students who were just barely younger than me.  I know that because some of them I saw and they all have gray hair now -- (laughter) -- which is a little troubling.

We've got a terrific congressional delegation who's here, and I just want to acknowledge them.  First of all, your outstanding senior Senator for the great state of Illinois, Dick Durbin is here.  (Applause.)  And we've got Congressman Bobby Rush.  (Applause.)  Congressman Danny Davis. (Applause.)  Congressman Bill Foster.  (Applause.)  And Congressman Mike Quigley.  (Applause.)  We also have Lisa Madigan, the Attorney General of Illinois.  (Applause.)  And my former seatmate in Springfield when we were both in the State Senate together, and is doing a terrific job.

And I want to thank David, who I was joking before we came out, is one of the country's foremost constitutional experts -- and a nice guy.  (Applause.)  And you guys are lucky to have him. In fact, when I was teaching here I think I stole his Con Law class for a while, and he

graciously gave it up because despite the privilege of grading 60 or 70 bluebooks -- (laughter) -- he apparently thought it was important for me to have that privilege as well.

The last thing I'll say by way of introduction -- I had a chance to talk to some young people over in the overflow room, mostly students, and I just said to them that having now been in politics for quite some time, seeing what lawyers are capable of doing every single day, working on a whole range of issues that are of huge importance to our democracy and to our society, I hope that all the students here are excited about the incredible changes and good that you are going to be able to do when you get out of here.

I know that sometimes the news feeds cynicism and democracy at this moment seems particularly frustrating. But each and every day, I see lawyers not that much older than you who are helping young people get an education, are making sure that consumers are protected, are helping to keep America safe, are ensuring that our health care system works for everybody, are helping to preserve the planet and fight against climate change. It is remarkable what you can do with your talents. And it doesn't always get a lot of publicity, but you can make a really meaningful difference.

So one of the reasons I wanted to come back is to recruit you. (Laughter.) To stay engaged, get involved, make a difference. It doesn't mean you have to run for office. It doesn't mean you have to run for office. It doesn't mean you even have to work for government. There are a lot of ways of serving. But I do hope that one of the things that you will take away from our discussion today and your extraordinary education here at the University of Chicago is the incredible high that you can get from serving this country.

So with that, what do you want to talk about, David? (Laughter.)

PROFESSOR STRAUSS: Well, let me start back when you were here as a teacher. I know you taught constitutional law, so you were thinking about the Supreme Court and thinking about the justices and what would make someone -- or what make someone a great justice or a successful justice. But you're in a different spot now. (Laughter.) Has your thinking

changed?

THE PRESIDENT:  Surprisingly, not as much as you would have expected. Obviously, we're having a substantial argument in Washington right now about not just a particular judge, but also about the process of appointing judges to the federal courts and appointing nominees to the Supreme Court.

And to get this out of the way, Merrick Garland is an extraordinary jurist who is indisputably qualified to serve on the highest court in the land. And nobody really argues otherwise.  I just want to be clear here.  If the question is qualifications and excellence, it is uniformly viewed by not just Democrats but also Republicans, those who have served -- lawyers, judges, legal scholars, members of the current Supreme Court -- that he is as good of a judge as we have in this country right now.  That he's fair, he's smart, he's objective.  He's a consensus builder.  He shows judicial restraint.  He's appreciative of the unique role of the Court, but also respectful of the role of the other branches of government.

So no one has plausibly made an argument that this is not the kind of person we'd want on the Supreme Court.  The question then becomes, why is it so hard for the guy just to get a hearing and a vote?

And this speaks to what's happened, generally, when it comes to the process of appointing federal judges.  It used to be that people read the Constitution and Article II powers fairly straightforwardly.  It says the President shall make these nominations with the advice and consent of the Senate.  And unless there was some sort of real problem with that judge's character or qualifications, it was fairly routine at every level -- both at the district court level, the appellate court level, and the Supreme Court -- that the person would be confirmed in short order.  There would be a hearing.  People would ask the potential judge a question or two or five or 10.  There would be questionnaires.  And once they had satisfactorily performed that process, then the Senate would vote.

And it was presumed -- it was understood that just as the President had a constitutional duty to make the appointment that the Senate had a constitutional duty to at least make a determination as to whether this person should be on the bench.

What has been unique in this process has been the growing attitude inside of the Senate that every nomination, no matter how well-qualified a judge, is a subject of contention.  In some cases, it's simply because one party or the other wants to gum up the works and so they will drag out confirmation longer and longer.  Even if, ultimately, the judge gets confirmed by voice vote, by unanimous consent in the Senate, they'll drag it out for two or three months, because if you're bogged down with judges, then it means other business can't be done.  So sometimes it's just strategic.

In other cases, the view has been that despite all the talk about people wanting objective judges who are just calling balls and strikes and don't bring any views to bear, that there are litmus tests that are applied that prevent a judge from getting a fair vote, even though they're qualified, because they don't meet the particular views of the party that's objecting.

And this problem got bad enough in previous administrations, but came to a head under my administration, in which we had a situation where we were starting to see six months pass or nine months pass before a judge could get a hearing.  This was when Democrats were in charge of the Senate, but because of the particular rules of the filibuster that previously had been used for just a few things but now were routinely deployed on everything, we just couldn't get judges through.  And you started seeing a crisis in vacancies across districts and circuits everywhere.

Finally, the Democrats said, we're ending the ability for Senate members to filibuster when it comes to district court and appellate court justices, but we're going to preserve it for the Supreme Court.

We now have a situation, after Judge Scalia's passing, in which it's not just that the Republican majority in the Senate intend to vote against a highly qualified judge, we now have a situation where they're saying, we simply will not consider the nomination itself.  We're just going to shut down the process.  And as a consequence, we have a 4-4 tie in the Supreme Court and potentially at least two Supreme Court terms in which this vacancy will remain.

That is unprecedented.  Not only are they not willing to hold a vote at this point, they have refused to hold hearings on Judge Garland.  And in some

cases, Mitch McConnell and others have said, we will not even show the courtesy of meeting with the judge to find out what he thinks.  And I think what's important for all of you to understand -- because you're going to be not just lawyers appearing in court, potentially, but custodians of our legal system and our democracy -- is if you start getting into a situation in which the process of appointing judges is so broken, so partisan that an eminently qualified jurist cannot even get a hearing, then we are going to see the kinds of sharp, partisan polarization that has come to characterize our electoral politics seeping entirely into the judicial system.  And the courts will be just an extension of our legislatures and our elections and our politics.

And that erodes the institutional integrity of the judicial branch.  At that point, people lose confidence in the ability of the courts to fairly adjudicate cases and controversies.  And our democracy can't afford that. Our system is designed to make sure that this branch works.  And it requires a broad consensus, even if we don't agree on any particular ruling, that the court's rulings itself are legitimate and consistent with our democratic design.  And that's why this is so important.  It's not just a matter of who is occupying that ninth seat in the Supreme Court. It has to do with how we, as a democracy, operate, and the particular authority that a court has to bring in order for our democracy to work.

That was a really long answer.  Others will not be as long.  (Laughter.)

PROFESSOR STRAUSS:  Well, let me ask you about that, Mr. President. How did we get to this point?  You hear sometimes that the problem is the Supreme Court has injected itself into political issues, and so, of course, it gets enmeshed in politics.  But the Supreme Court has been controversial almost from the beginning -- from the Jeffersonians' attack on the Marshall Court, all the way through the "Impeach Earl Warren" billboards in parts of the country in the '50s and '60s.  And we haven't had this before.  So is there -- do you have an explanation for what it is that brought us to this position?

THE PRESIDENT:  I think there are a variety of explanations. First of all, it's important to underscore what you just said.  And all of you law students, even if you're not critical, legal theorists, or what have you, I think just from reading cases, you will acknowledge that there's politics in legal

rulings.  When we make decisions about right, wrong, what are the rules governing our society, et cetera, that that's an extension of our broader political and democratic conversation.  Nobody is denying that.

And you're right.  There have been controversies in the past about how we should decide the balance between liberty and security, about how do we treat minority groups to assure that they are protected from majority rule.  How do we make sure that the political process itself has integrity and that our votes count?  Those are all issue where passions are real and people have opinions.  And there's nothing wrong with that.

But I think what changed was when the Congress itself, and the Senate in particular, began to change.  I think in some ways the judicial process is a casualty of some broader trends in our democracy.  First of all, our politics have become much more polarized.  There's been something called the "great sorting" because of gerrymandering, because of how our media works where folks either watch Fox News or they read The New York Times, but rarely do both.  Positions get hardened and reinforced.  Partisans carry more weight within each party.  The notion of a liberal Republican or a conservative Democrat -- those things broke down.  And so politics itself got more polarized.

That, then, fed into a culture in Congress in which basic comity and habits of courtesy and process and institutional respect for people that you can agree with, those things began to break down.  The filibuster, as I said, started becoming just standard practice.  There's nothing in the Constitution that says every item that comes before the Senate is supposed to get a super majority.  It used to be that the filibuster -- it doesn't have a very distinguished history -- was used principally for blocking civil rights and anti-lynching and voting rights legislation.  That was bad enough.  It then suddenly became the norm for everything as minority parties started to decide that they wanted to block what the majority of senators were in favor of.  And so all of this I think contributed to a breakdown of the process.

Now, in fairness, Democrats are not blameless on this.  If you talk to Republicans, they'll also often point to the Bork nomination as where this all started.  And there have been times where Democrats used the filibuster to block what Republican Presidents or conservative legal

theorists viewed as eminently qualified jurists.  I will say that there has not been a circumstance in which a Republican President's appointee did not get a hearing, did not get a vote, and as a general proposition, they have been confirmed even where there have been strong objections.

So what you have here is, I think, a circumstance in which those in the Senate have decided that placating our base is more important than upholding their constitutional and institutional roles in our democracy in a way that is dangerous.  And there are other examples of it, but this judicial nomination process I think has become an extreme example.

PROFESSOR STRAUSS:  Let me take you back a step to how -- to your thinking about when you're making an appointment.  And I'm going to try to put it in an historical context a little bit.  You have Presidents who really set out to reshape the Court.  And Franklin Roosevelt may be the clearest example.  He was determined to find justices who would uphold New Deal legislation.  Richard Nixon wanted justices who would limit the rights of people accused of crimes, and that's sort of one model.

And then you have Presidents who did not have any particular agenda.  And I think President Eisenhower is an example.  He appointed three of the great justices of the 20th century -- Chief Justice Warren, Justice Harlan, Justice Brennan.  But his appointees came from different backgrounds, no identifiable tendency in the way they thought about the Constitution.

So do you see yourself as one of those models, or something different from both?

THE PRESIDENT:  There's no doubt that in making my appointments, the values of the justice matter to me.  And what I mean by that is not how they'd rule on a particular issue.  In fact, we're very careful when I interview candidates not to ask them about a particular case or controversy that might make it seem as if I want a particular outcome.  But what I've been consistently looking for -- and this is what I saw in Justice Sotomayor, what I saw in Justice Kagan -- is people who, number one, have intellectual integrity.  And what that means is, is that they look at the facts and the law, and even if it's uncomfortable to them, they don't like the outcome, they follow the law, and they recognize that that's their

job.

Number two, that they bring a humanity to the job. And what I mean by that is that, particularly on the Supreme Court, nine out of 10 cases -- well, certainly in the federal courts -- nine out of 10 cases we can probably arrive at an outcome just by applying basic tenets to constitutional interpretation. There's not going to be a lot of controversy. The cases that really matter are the ones where there's ambiguity, where there's a lack of clarity, where it requires constitutional principles being applied in a way that is true to precedent, is true to basic legal tenets, but also that understands the unique role of the Court in making sure that people who are locked out of the political process, for example, are not permanently locked out, that they have some recourse; that we have justices who understand how the world works so that they are not entirely blind to the history of racial discrimination or gender discrimination, or how money operates in our world.

Not because that necessarily leads them to rule on a particular issue, but because it means that when they're looking at a tough case in which statute or the Constitution does not provide an immediate, ready answer, that they can apply judgment, grounded in how we actually live and the ideals and principles that have made this such an extraordinary country. I want them to have lived a little and be able to see the wide spectrum of people that they're going to be wielding this enormous power over.

And so, a lot of times when I talk to the candidates for the judiciary, I spend time asking about their families and them growing up, and what were formative experiences in their minds. And in some ways, that reveals more than anything.

And part of the reason that I think Merrick Garland would be such an extraordinary judge is not just because he's already been an extraordinary judge, but I think about his life story. And I mentioned this in the introduction -- when he was a high school kid, as class valedictorian, he's got a student speaking ahead of him who lambasts the Vietnam War, and parents are trying to unplug the guy's mic, and Merrick comes in and -- not because he necessarily agrees with the student, but, impromptu, provides a vigorous defense of free speech. As a 17- or 18-year-old kid -- that tells me something about him. It gives me confidence that this is

4/11/2016
Case 1:15-cv-09554-PGG Document 71 Filed 04/13/16 Page 12 of 31
Remarks by the President in a Conversation on the Supreme Court Nomination | whitehouse.gov

somebody who's thought about what our core values and ethics are as a society.

When you hear about the work he did in the Oklahoma City bombing, and he's presiding over the investigation at the Justice Department, and the fact that he was meticulous in how he conducted that investigation, and didn't cut corners -- even though, in the wake of those kinds of terrorist attacks, oftentimes it's convenient, because people aren't going to call you on it, to cut corners -- and at the same time, how he kept the program mourning the deceased from the memorial because he knew that each one of those people who had been killed, and each one of those families had been affected in such profound ways -- that tells me something about who he is.

And that, as much as anything, I think is going to give me confidence that that's the kind of person where, if I'm before a judge, I want to make sure that I've got somebody who's wise and who cares about people and is not arbitrary, and can provide confidence to the justice system. And I also think part of the reason I thought Merrick was ideal now is precisely because of all the polarization we were talking about earlier. What a good moment for us to have somebody who is respected by both sides, and who Chief Justice Roberts served with on the Appellate Court and befriended, and consistently said -- despite being on the opposite ends of a bunch of decisions -- said this is somebody who, if he says you're wrong, you've got to think long and hard about it.

He embodies and models what it is that we want to see in our juris prudence.

PROFESSOR STRAUSS: Let me sort of pick up on that. I mean, as you know, some people on the left were disappointed with your choice of Chief Judge Garland. They thought you should have appointed someone who would be more aggressive in moving the Court in a certain direction. And I just -- I guess what I want to say is, those of us who knew you "back then" could have said you shouldn't be surprised, because if I remember correctly -- and correct me if I don't -- when you were teaching constitutional law, there are people in that line of work who hold up the Warren Court as the model and say the Court's job is to be really on the front lines of attacking society's problems. And if I remember correctly,

you were skeptical of that when you were a law professor. So am I right in remembering that, and has the skepticism carried over?

THE PRESIDENT: No, no, I think you're right about this. It's an adage in con law, and you're familiar with this -- probably the students are too -- that the courts are a terrific shield, but they're not always a very effective sword. And what I mean by that is, is that there have been moments in history -- Brown v. Board of Education being the best example, and on the other end of the spectrum, a decision like Dred Scott, which was antithetical to what we want to see a court do -- there are certain moments where, like in Brown, that democracy has broken down in a fundamental way. The majority has shut down access for the petitions for redress from a minority group. There are times where an individual who is engaging in, let's say, highly unpopular speech is not going to be able, through the political process, to uphold the values that we, collectively, have decided are pretty important to uphold.

And so, in those circumstances, I have a very progressive view of how the courts should operate. But as I think Judge Garland said, being a federal judge doesn't mean that you have this broad writ to simply remake society. Ideally, you've got a political process that does that; that we argue about issues, and we elect representatives, and we get votes, and we pass bills, and we get a new administration and they overturn stuff that we passed. And it's rough, and it's tumble, and it's not always elegant, but that's the constitutional design. And it has the benefit of making sure that separation of powers and decentralization of power in our society keeps this lumbering ship moving in a pretty good direction.

And so it's been rare -- and this is by design -- that the Court engages in massive social engineering. Now, I care deeply about -- there are a whole range of progressive causes that I will continue to fight for as long as I have a breath. I believe in a society that is doing something about climate change in an aggressive way. I believe in a society in which every child is able to get a decent education and opportunity. I believe that everybody should have health care in a society that's wealthy -- it's not a privilege, it's a right. (Applause.) I believe that our criminal justice system is flawed in a whole range of ways.

A couple of weeks ago, or maybe it was last week, I had lunch with a

sampling of the people that I've pardoned for nonviolent drug offenses. And I've got a woman sitting next to me who, at a very young age, in her early 20s, was sentenced to life in prison for a nonviolent drug offense. That's crazy. It makes no sense. It was unjust and counterproductive, and leaves huge scars not just in that woman's family and her children, but in our society as a whole.

So there are a whole bunch of things I've done as President and I intend to continue to do and to advocate for. Those are not things, though, that typically a Supreme Court justice is in the position to get done. They don't have taxing power. They don't necessarily have the expertise to be designing programs to get at the things that we care about. And so I do have a modesty in terms of my expectations for what the Court should do.

But I want the court to do what it should do really well. I want a court that does believe that equality under the law is equality under the law -- not just the words, but that it is operationalized, that it's real. I want a court that is treating a poor indigent criminal defendant the same as a wealthy criminal defendant, and that justice is blind with respect to -- she agrees with me. (Laughter.)

So modesty in the scope and the nature of what the law is, but doing really well what the Court is designed to do -- that's what I'm looking for in a justice.

PROFESSOR STRAUSS: I think we can open it up.

THE PRESIDENT: Let's open it up to questions. There you go, a little Socratic method here. (Laughter.) State the case! (Laughter.) No, I'm teasing. I'm teasing. This young lady right here in the green -- yes. Do we have a mic? Let's give them mics so everybody can hear you. Introduce yourself, by the way.

Q   Hi.

THE PRESIDENT: Hi.

Q   My name is Amelia.

THE PRESIDENT: Hey, Amelia.

Q   I actually had the opportunity to ask you a question when I was 15 years old, in New Hampshire.

THE PRESIDENT:  Wow.  (Laughter.)

Q    So I'm really happy to --

THE PRESIDENT:  Are you a student here now?

Q   I am.

THE PRESIDENT:  That's very cool.  Did I answer your question the last time?

Q    You did, very well.  (Laughter.)

THE PRESIDENT:  Thank goodness.  All right, what do you got?

Q    So I'm really happy to hear that you said you were going to continue to push for the issues that you care about, because I, of course, believe that the push for the Supreme Court nomination is incredibly important.  I'm just a little concerned that other issues could get left behind.  One such issue, for example, is criminal justice reform -- specifically, the problem of mass incarceration.  So I was wondering if you could speak to what more you'll do in your last 10 months to address this issue.

THE PRESIDENT:  Great.  It's a great question.  We're in this really interesting moment where generally Congress is thoroughly unproductive -- not, by the way, because of the members of Congress who are here -- (laughter) -- who are all doing great work -- (laughter) -- but in the aggregate it's not doing much.

One exception has been this growing interest, this movement in criminal justice reform.  And it's bipartisan and it's sincere on the part of all sides on this.  And it's an interest convergence.  You have fiscal conservatives who have been seeing how expensive it is to incarcerate people year after year after year, and how it's breaking the bank -- particularly at the state level, where if you track spending on public education and spending on incarceration over the last 25, 30 years, there is almost a direct line between more people in jail and less support for public universities, for example.  So there's a fiscal concern.

You've got a libertarian strand of conservatives who really believe why is it the government's business if somebody is taking -- smoking pot, let's say, and why would we want to jail them for 20 years? You've got a very sincere evangelical movement that oftentimes is involved in reentry programs or prison ministries, and so have embraced the idea of a second chance.

And so you combine that with law enforcement that I think has begun to recognize that a lot of how we have prosecuted the war on drugs has been unproductive, and that recidivism is inevitable if people are getting no skills. They're incarcerated for decades, and then we're just releasing them with no possible support. And then the long-standing progressive view that a lot of our criminal justice system has been tainted by racial discrimination and class bias. All those things are converging.

And so now we've got some really interesting coalitions. You've got the ACLU and the Koch brothers agreeing on this, which does not happen often. (Laughter.) Dick Durbin has been one of the key leaders in the Senate in shaping a criminal justice reform bill that has a real chance of passage. And I think it's really important to understand the nomination process with Judge Garland is not holding back our ability to move forward.

It would be one thing if Mitch McConnell was saying, man, it's going to take so long to schedule all the hearings and the votes, and we won't have time because we're just so busy that we can't then do criminal justice instead. But since there has been a spike in the number of days off in this Congress, and, typically, a judicial confirmation takes less than three months from the time that person is nominated -- Judge Alito, for example, took 82 days -- this is something that shouldn't prevent us from getting done the criminal justice issues.

I think what's been tougher is just managing the traditional politics around being soft on crime versus being tough on crime. And right now because crime rates -- sadly except for in certain neighborhoods in Chicago and a few other cities -- have been going down in ways that are remarkable and nobody can fully explain, there is less profit in saying I'm going to be tough on crime.

But there is always a hesitance on the part of legislators because very rarely is a politician punished for having been too tough on crime and sentencing.  But occasionally, á la Willie Horton, they feel that a vote that can be perceived as lenient might come back to bite them.

The good news is that, so far at least, people have stuck with it.  And I'm modestly optimistic that we can get something done this year.  It won't solve the problem of mass incarceration -- because that was a process that took 20, 30 years to get to where we are now, where we account for 5 percent of the world's population and 25 percent of the world's prisoners, so it's going to take some time to reverse.  But the legislation that's pending right now provides meaningful reductions in the standards for sentencing around nonviolent drug crimes.  It does some very important work in terms of reentry, diversion programs.  It breaks this psychology that we just have to lock people up in order to keep ourselves safe.

One last element to this that has been interesting is the opioids crisis that some of you may have read about.  Right now painkillers -- overdoses of people taking painkillers kills more people than traffic accidents.  It's a remarkable statistic.  There has been this huge spike in painkiller addiction, which is then leading to heroin addiction, because oftentimes heroin is cheaper than painkillers.  And four out of five people who get addicted to heroin start their addiction with OxyContin or some other painkiller addiction.  And unlike crack, it's not just affecting inner-city African American or Latino communities.  It's widespread.  It's pervasive. It's seeping into rural areas. And it's a tragic issue that we are really spending a lot of time focused on.

But what's interesting is, is that the politics of this changes a little bit where when elected officials see kids who are like their kids getting hooked and going through these terrible things, there's been a greater predisposition to think of this as a public health issue rather than a criminal justice and incarceration issue.

And that's -- I'm just being blunt -- that's the truth.  But it actually has had an impact in terms of an openness I think to re-examining some of our drug laws.

Good question.  I'm sure your question eight years ago was really good,

too.  (Laughter.)

All right, I'm going to go boy-girl-boy-girl just to make sure this is fair.  We monitor these things.  (Laughter.)  Yes, gentleman right here, in the tie.  You.  Yes, you look sharp.  (Laughter.)  Do you wear a tie every day to class?  That's good, man.

Q    I'm Jimmy.  I'm also a 1L.  I've never asked you a question before.  (Laughter.)

THE PRESIDENT:  Okay.

Q    So this might not go very well.  (Laughter.)  But I've written it down so hopefully I can read it.  Mr. President, we are currently in the midst of a polarizing, political election cycle dividing both major parties along populist and establishment fault lines.  Do you anticipate this divergence within the Democratic Party widening to the extent we saw with the tea party's emergence within the ranks of the Republican Party?  And if not, what do you worry about for the future of the Democratic Party?

THE PRESIDENT:  Short answer is, no, I don't.  The cleavages inside the Democratic Party are not comparable to what we're seeing in the Republican Party right now.  The argument inside the Democratic Party is a little bit more about means, less about ends.

If you look at our two Democratic candidates, they believe that everybody should get health care.  They believe that every child should get a good education.  They believe that climate change is real and that we should do something about it.  They believe in equality for the LGBT community.  Right?  If you go through the list, there's not a huge divergence there.

I think that in the Democratic Party, there is a populist impulse that grows out of what I also think has happened for folks who are voting in the Republican primary, this frustration in the wake of the financial crisis and the bottom falling out for people who lost their jobs, or lost their homes, or lost their pensions; that the world is moving fast, the ground is not firm under their feet.  And even before that crisis, wages and incomes were not going up at the same pace as productivity, corporate profits, and so forth.  And so there is a sense the game is rigged.  And we have to more fundamentally change that game, that system -- whether it's Wall Street,

or how Washington operates, or what have you.

Some of that impulse is healthy. I think you want people to be asking hard questions about injustice economically and the way that insiders in the political process may not fully represent the interest of everyone.

The danger, whether for Democrats or Republicans, is in a closed-loop system where everybody is just listening to the people who agree with them, that you start thinking the way to get to where I want to go is to simply be as uncompromising as possible, and hold the line, and not pay attention or listen to what the other side has to say. And that is sort of a tea party mentality. And that anybody who suggests, well, there's another point of view, or there's a whole half of the country that completely disagrees with us that we have to work with, well, then you must be a sellout, or you must be corrupted, or you must be on the take, or what have you.

And that is not, I think, useful. It's not say that there isn't corruption, that there isn't compromise -- people compromising principles for less-than-noble means, et cetera. Those things happen and they should be called out.

But a lot of the reason why a lot of Democrats who supported me and still support me got frustrated is because a bunch of the country doesn't agree with me or them, and they have votes, too, and they elect members of Congress. And that's how our democracy works. It's not a situation, if you don't get everything you want, it's always because the person you elected sold you out. It may just be because in our system you send up taking half loaves.

I could not be prouder of the Affordable Care Act, but it was a messy process. It doesn't have a public option. It's not single-payer. If I were designing a system from scratch, I would have designed a more elegant system and a more efficient system. But that's not what was possible in our democracy -- in the same way that Social Security when it first started was a meagerly program providing benefits to just a few people and historically cut out for purely racist reasons domestic servants or sharecroppers or what have you. And then over time you kept on improving it. That's how change generally happens.

And I think the thing that Democrats have to guard against is going in the direction that the Republicans are much further along on, and that is this sense of we are just going to get our way, and if we don't, then we'll cannibalize our own and then kick them out and try again, and we narrow our viewpoints more and more until finally we stake out positions that are so extreme that they alienate the broad public.

I don't see that being where the Democrats go. But it's always something that we have to pay attention to.

Q   Thank you so much for being here. I'd like to know how have your views on the Supreme Court nomination process changed since you taught constitutional law here at the University of Chicago.

THE PRESIDENT: My views on how it should work hasn't changed. My views on how it currently works obviously are a source of frustration. Look, just to kind of wrap up this Supreme Court conversation, I think it is perfectly acceptable for Republicans to decide that even though Merrick Garland is highly qualified, even though he's indisputably a good and fair judge, even though he's gotten the highest ratings from all the bar organizations and others that have examined his record, that I just don't agree with him on X, Y, Z, and I'm going to vote against him because I believe in something different on important issues.

What's not acceptable is not giving him a vote, not giving him a hearing, not meeting with him. What's not acceptable, I believe, is the increasing use of the filibuster for somebody who's clearly within the mainstream, or to essentially say that we are going to nullify the ability of a President who is from another party from making an appointment. And we're going to wait to see if maybe we can get a guy from our party to make the appointment. That is where you have a process foul that corrodes the ability of the Court to function effectively.

If you play out how much of a problem this could end up being -- if, in fact, Mitch McConnell sticks to not giving a hearing and not giving a vote, and let's say, from their perspective, everything works out great and their nominee, whoever that might be, wins and takes over the White House, and they, then, make an appointment -- the notion that Democrats would then say, oh, well, we'll just go along with that -- (laughter) -- that is

inconceivable. Right?

So now the Democrats say, well, what's good for the goose is good for the gander, we'll wait four more years to see how the next President comes in, at which point what's most likely then is Mitch McConnell will then eliminate the filibuster possibility for Supreme Court justices, as it was eliminated for the other judicial appointments. And now it's just a majoritarian exercise inside the Senate of who controls the presidency and who controls the Senate. And if different parties control the White House and the Senate during that period of time, you're not going to get any appointments done -- which is a disaster for the courts, generally.

For two reasons. One is, there's a lot of work that needs to get done and you need judges. And right now, there are emergency situations in districts across the country. But the second thing that happens is people will, at that point, just become more and more cynical about decisions that are coming down from the Court. They're already cynical because so much of so many opinions just end up being straight 5-4, and it starts feeling like this is just a partisan alignment. But it gets much worse under these circumstances. People then just view the courts as an extension of our political parties -- polarized political parties.

And if confidence in the courts consistently breaks down, then you start seeing our attitudes about democracy generally starting to break down, a legitimacy breaking down in ways that are very dangerous.

It's a gentleman's turn. Right here in the front. I am impressed by the way you guys did all get dressed up. (Laughter.) Was there a memo sent out? Did the Dean say, you guys, we want you to all -- because you aren't going to class like this. (Laughter.) I know. I remember. (Laughter.)

Q   Hello, Mr. President. Thank you very much for being here with us today. I'm a 2L here at the law school. My question for you is, what sorts of constitutional questions were at the forefront of your mind when deciding who your nominee should be? And what sorts of constitutional questions do you think Americans should be asking themselves when assessing your selection and thinking about the 2016 presidential election?

THE PRESIDENT: Well, I will tell you, as I said before, I'm very careful not

to delve too specifically into a candidate's position on live issues.  You're a well-informed 2L, you know the issues that people debate.  There's a standard set of social issues that have been roiling society and the courts for a long time -- whether it's LGBT rights, or abortion, or civil rights.

What's interesting is there are a set of new issues that are going to be coming up that, for your generation, I think are going to be increasingly salient.  One great example is this whole debate around encryption, which I think is just the tip of the iceberg of what we're going to have to figure out.  In a society in which so much of your life is digitized, people have a whole new set of privacy expectations that are understandable.  They also expect, though, that since their lives are all digitized, that the digital world is safe, which creates a contradictory demand on government -- protect me from hackers, protect me from terrorists, protect me from et cetera, et cetera, et cetera, but I don't want you to know any of your [sic] business and I don't even want you to have the ability to investigate some of that business when it happens because there's broader implications and we're worried about Big Brother.  And so there's going to be a whole series of issues around that that I think will be coming up.

I think there are a range of economic issues that date back very far, to the earliest days of the Court and were prominent during the Great Depression and FDR's era that have gone into abeyance -- people don't pay attention to them as much in terms of monopoly concentration, or antitrust issues, et cetera -- but I think in this current environment are going to be coming more prominent over time.

And then, political participation issues and voting issues I think, and money in politics issues -- that's a whole series of issues that I do believe are an important role for the Court to play.  Because if we're not effectively setting the rules of the political process, if that is delegitimized, then whatever outcomes are generated are subject to just endless contention.

And this is separate from the judiciary.  This is your President editorializing.  (Laughter.)  We really are the only advanced democracy on Earth that systematically and purposely makes it really hard for people to vote.  And we sort of take it for granted.  I mean, we sort of just assume, yeah, that's I guess how it is.  There's no other country on Earth that does

that.  And there's a legacy to that that grows directly out of a history in which first property men, then white men, then white folks didn't want women, minorities to participate in the political process and be able to empower themselves in that fashion.

Now, that's the history.  We should be a society in which, at this point, we said, yeah, that history wasn't so good, that's not who we are, and there was a Civil War fought about all this stuff, and we passed a whole series of laws like the Voting Rights Act, and at this point we should be at the point where we say, you know what, we want everybody to vote because that's the essence of our democracy.  But we have not just federal laws, but state laws, that unabashedly discourage people from voting -- which is why we have some of the lowest voting rates of any advanced democracy in the world.

And that's a problem.  That's not something that -- I'm saying that to Congress, as well as to the presidency, as well as to governors, as well as state legislators, as well as to courts. That can't be right!  There's no justification for that!  You can't defend it!

And I've always said -- and this goes back to the young man's question earlier about political polarization -- maybe the single biggest change that we could make in our political process that would reduce some of the polarization, make people feel more invested, restore integrity to the system, would be just make sure everybody is voting.  Australia has got mandatory voting.  You start getting 70-80 percent voting rates, that's transformative.

All right.  How much time do we have, by the way?  How many?

MODERATOR:  Time for one more.

THE PRESIDENT:  We'll take two.  (Laughter.)  The young lady in the green, right there in the sweater.  Yes, that's you.  Yes. You didn't remember what you were wearing today, did you?  (Laughter.)

Q   So I think we can agree that in our nation, we celebrate diversity. Diversity of ethnicity is the basis, the background.  And I'm just wondering -- well, of course, U of Chicago is a diversity of ideas.  I'm just wondering what diverse characteristics Judge Garland would bring to the Supreme

Court.

THE PRESIDENT:  Well, he's from Skokie -- (laughter and applause) -- which is very important.  It's a great place.  It's a great town.  The way I've thought about diversity is not to think about any single seat as, oh, I've got to fill this slot with this demographic, but rather if I've got a broad set of nominees to make -- and this is true across the board -- how do I make sure that I'm intentional throughout that process so that the talent of every American is, and every potential candidate gets a fair look, and I have confidence that if I stick to that, if I do that, if I make sure that I'm broadening the search, broadening the pool, looking at a bunch of folks even if they're not going through the conventional paths, that I'll end up -- the process will result in diversity.

And that, in fact, is what's happened.  I am -- not to brag, but I have transformed the federal courts from a diversity standpoint with a record that's been unmatched.  (Applause.)  We've got more African Americans on the circuit courts than we ever has before.  We've got -- I've appointed more African American women to the federal courts than any other President before.  I've appointed more Latinos than any President before.  I've appointed more Native Americans, more Asian Americans, more LGBT judges than ever before.

But at no point did I say, oh, you know what, I need a black lesbian from Skokie -- (laughter) -- in that slot.  Can you find me one?  (Laughter.)  I mean, that's just not how I've approached it.  It turns out that if the process is fair and you are saying that it's important that our courts are reflective of a changing society, you'll end up with a really good cross-section of people who are excellent.  And that's who we've been able to appoint.

And so, when I looked at Merrick Garland, that was the person that -- the difference between the Supreme Court is just a handful of seats come up at any given time now.  I appointed a Latino woman and another woman right before that, so, yeah, he's a white guy, but he's a really outstanding jurist.  Sorry.  (Laughter.)  I think that's important.

But this speaks to the broader debate about diversity that I think is important and obviously churns up in college campuses a lot.  The

question is, have you set up a process and are you intentional about giving everybody a shot? And are you thinking about roadblocks to why we're not seeing a more diverse population? And when you start asking those questions -- in whatever institution. I mean, I just met with the Chairman of the Joint Chiefs of Staff and the Combatant Commanders, our key military leaders. And the U.S. military, interestingly, has probably done as good of a job as any institution in our society when it comes to integration and bringing diverse people in, but, as you go up the ranks, you start seeing that it becomes less and less reflective of the broader population and the troops, the men and women in uniform who are coming in.

And so we had a really interesting conversation about what's happening? How much of this is that the young African American or Latino officer, or woman officer isn't mentored by the person right above them, and steered into particular assignments that are less likely to achieve a promotion? And what can we do about a different set of financial burdens that may exist? And if a lot of those folks are going in as enlisted men and women, because that's the opportunity that was presented to them and nobody told them they could apply to West Point, what are we doing to find outstanding enlisteds, and saying, you'd make a good officer and we're going to groom you?

And all of that -- that's not as satisfying as, when it comes to publicity, as just checking a box and saying, look, I appointed this person or that person in any particular slot. But that's where you start changing systems, and you start changing institutions, and you end up with a really broad-based change in access. And that's something that I really care deeply about because, just as is true in the military, it's true generally. Look, our society is changing. You cannot have a successful America if we are leaving out big chunks of the population from opportunity and leadership. It just doesn't work.

And it's the same argument I make internationally in countries that are still repressing women -- saying, your society cannot work, it doesn't work if more than half your population is constrained. If the half of that population that is most likely to be raising your children and teaching the next generation is not getting opportunity, your society will fail over the long term. And that's just true generally.

All right, one last question.

Q    What happens --

THE PRESIDENT:  Excuse me, you were not called on.  (Laughter.)  And you are a journalist.  And I'm calling on students.  So, thank you very much.  This wasn't a press conference.

So, let's just see -- it's a gentleman's turn.  This gentleman right there.

Q    Hi, my name is Seth.  I'm a 3L.  If you don't mind me reading my question --

THE PRESIDENT:  It's okay.  This is what I was saying about you guys and your phones.  (Laughter.)  By the way, are you now  -- I'm assuming you can't carry your phones into court, can you?

Q    Actually, it depends.  (Laughter.)

THE PRESIDENT:  I'm going to say, you guys might want to practice -- (laughter and applause.)

Q    I'll try to work on that.  (Laughter.)  So one issue that Judge Garland would likely never be able to consider if he were confirmed concerns the President's authority to conduct **drone** strikes away from active battlefields.  And these are strikes that you have continuously authorized on the basis of vague legal standards that you unilaterally deem to be satisfied in each case without ever appearing before a court, and in the process killing hundreds of innocent civilians as well as, in some cases, American citizens.  So my question is, how are these killings morally and legally justified?  And what kind of message does this **drone** program send about America's values to the world, the American people, and to law students like myself who refuse to put our trust in an opaque process?

THE PRESIDENT:  I think that's a great question -- although I will say that I will dispute some of the underlying premises that you asserted as facts.  But I think it's an important topic, and it's a fair one.

When I came into office, we were still in the midst of two wars, in Iraq and Afghanistan.  And in the border regions between Afghanistan and Pakistan, al Qaida was still highly active.  And **drone** technologies began

SHARE THIS:







to develop in parallel with -- had developed prior to my presidency, but started to really accelerate in terms of the technology and the precision with which strikes could be taken.

And the challenge for me as Commander-in-Chief has consistently been how do you think about this new technology in a way that is consistent with morality, ideals, laws of war, but is also consistent with my first priority as President and Commander-in-Chief, which is to keep all of you safe, including you.

And so I think it's fair to say that in the first couple of years of my presidency, the architecture -- legal architecture, administrative architecture, command structures -- around how these were utilized was underdeveloped relative to how fast the technology was moving. So another way of saying this is our military or our intelligence teams started seeing this as really effective. And they started just going because the goal was let's get al Qaeda, let's get these leaders. There's a training camp here. There's a high-value target there. Let's move. And it was -- the decision-making was not ad hoc, but it was embedded in decisions that are made all the time about a commander leading a military operation, or an intelligence team trying to take out a terrorist. And there wasn't enough of an overarching structure, right?

So you may recall -- but if not, I'm sure we can send it to you -- I gave a speech at the National Defense University in which I said that we have to create an architecture for this because the potential for abuse -- given the remoteness of these weapons and their lethality, we've got to come up with a structure that governs how we're approaching it. And that's what we've done. So I've put forward what's called a presidential directive. It's basically a set of administrative guidelines whereby these weapons are being used.

Now, we actually did put forward a non-classified version of what those directives look like. And it says that you can't use these weapons unless you have near certainty that there will not be civilian casualties; that you have near certainty that the targets you are hitting are, in fact, terrorist organizations that are intending to do imminent harm to the United States. And you've got all the agencies who are involved in that process, they have to get together and approve that. And it goes to the highest,

most senior levels of our government in order for us to make those decisions.

And what I've also said that we need to start creating a process whereby this -- whereby public accountability is introduced so that you or citizens or members of Congress outside of the Intelligence Committee can look at the facts and see whether or not we're abiding by what we say are these norms.

And we're actually -- there's a lot of legal aspects to this because part of the problem here is, is that this drone program initially came through the intelligence side under classified programs, as opposed to the military. Part of what I've also said is I don't want our intelligence agencies being a paramilitary organization. That's not their function. As much as possible this should be done through our Defense Department so that we can report, here's what we did, here's why we did it, here's our assessment of what happened.

And so slowly we are pushing it in that direction. My hope is, is that by the time I leave office there is not only an internal structure in place that governs these standards that we've set, but there is also an institutionalized process whereby the actions that the U.S. government takes through drone technology are consistently reported on, on an annualized basis so that people can look.

And the reason this is really important to me -- and this was implied in your question -- is there is a lot of misinformation about this. There is no doubt -- and I said this in an interview I think recently -- there is no doubt that some innocent people have been killed by drone strikes. It is not true that it has been this sort of willy-nilly, let's bomb a village. That is not how folks have operated. And what I can say with great certainty is that the rate of civilian casualties in any drone operation are far lower than the rate of civilian casualties that occur in conventional war.

So the irony -- let's take an example like the bin Laden raid. This was as precise, as effective an operation that I don't think anybody would dispute was in the national security interests of the United States. And we put our best people in there who operate as precisely and as effectively as any group of individuals probably ever have in the history of the planet. And

they executed their mission flawlessly. But there were a number of people who were killed in that who you might describe as not the targets of the mission -- members of bin Laden's family, for example. Now, that would be counted as a civilian casualty under the standards from which you drew your information. And if you calculated it as a percent, there was actually a pretty high civilian casualty rate for this extraordinarily precise mission.

Now, imagine during the height of the Iraq war, or when we were still actively fighting in Afghanistan, the number of civilians who were killed in normal military operations. We talk about the number of U.S. troops that were killed in Iraq. The number of Iraqis that were killed -- primarily by AQI and those we were fighting, but also by U.S. military that was trying to be as careful as possible in chaotic situations, like Fallujah or Ramadi -- were in the tens of thousands.

So part of my job as President is to figure out how I can keep America safe doing the least damage possible in really tough, bad situations. And I don't have the luxury of just not doing anything and then being able to stand back and feel as if my conscience is completely clear. I have to make decisions because there are folks out there who are genuinely trying to kill us and would be happy to blow up this entire room without any compunction, and are actively trying to find ways to do it.

And I wish I could just send in Iron Man -- (laughter) -- no, no, I don't mean that as a joke. I just mean I wish that the tragedy of war, conflict, terrorism, et cetera, did not end up creating circumstances where we, wielding kinetic power, don't end up hurting anybody who shouldn't have been hurt.

But what I try to do is to set up the system as best as I can. And I think it is very important for those who are critics of the U.S. government -- and this includes folks on the outside -- to examine the incredible progress that we've made over the course of a couple of decades. Because this conversation didn't even exist, it did not even cross the minds of people in the White House as recently as 30 or 40 years ago. I mean, it wasn't even a factor. And we anguish over this in a very serious way.

But what I do think is a legitimate concern is, is that the transparency

issues. I think that the way that this got built up through our intelligence and what's called our Title 50 programs meant that it did not -- it wasn't subject to the same amount of democratic debate as when we are conducting what are called Title 10 Department of Defense conventional operations. And that's done a disservice not only to the public being able to examine where we made mistakes and create corrective action, it's actually also done a disservice to the incredibly dedicated men and women in intelligence and in operations who perform these operations who are subject to accusations that somehow they're irresponsible and bloodless and going around blowing up children, which is not the case.

And our popular media I think has been able to just project a whole bunch of scenarios that are generally not accurate.

I guess I should stop there. (Laughter.) But thank you for the question. It was a legitimate one.

I'll end where I started. Just based on the quality of the questions and your very sharp appearances -- (laughter) -- you guys have an enormous amount to contribute. Don't let the day-to-day noise and news and frustrations with our democracy discourage you from being involved.

I'm phasing out of this particular part of my life. But I've said this before -- and I believed it when I was teaching here, I believe it even more now after having been President -- the most important office in a democracy is the office of citizen. I really believe that. Change happens when citizens are informed, are engaged, are paying attention, are asking tough questions -- asking tough questions of themselves, by the way, not just of others -- not too comfortable in whatever dogmas that we all attach ourselves to. And you are learning the kind of critical thinking in this school that will allow you to become really good citizens. Use it.

Thanks.

PROFESSOR STRAUSS: Thank you, Mr. President. (Applause.)

END
4:12 P.M. CDT

     

**HOME**   **BRIEFING ROOM**   **ISSUES**   **THE ADMINISTRATION**   **PARTICIPATE**

**1600 PENN**

En Español  |  Accessibility  |  Copyright Information  |  Privacy Policy  |  USA.gov